(150 App. Div. 369.)

In re FLANNERY.

(Supreme Court, Appellate Division, First Department. May 17, 1912.)

1. EMINENT DOMAIN (§ 69*)—COMPENSATION—NECESSITY.

When a municipality requires the property of an individual for a public improvement, it can only acquire it, in the absence of agreement with the owner, by paying its fair value as ascertained by a judicial proceeding.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 171–179; Dec. Dig. § 69.*]

2. ATTORNEY AND CLIENT (§ 147*)—COMPENSATION OF ATTORNEY—CONTINGENT FEES.

An agreement between an owner, whose property is condemned for a public improvement, and an attorney representing him in the proceedings, by which the attorney's compensation is fixed by the amount of the award which he secures, if voluntarily made and induced by no fraudulent misrepresentations or concealment of facts which should have been disclosed by the attorney, is proper and enforceable; but such transaction imposes upon the attorney the utmost good faith in his relation to his client and in obtaining such agreement.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 351; Dec. Dig. § 147.*]

3. ATTORNEY AND CLIENT (§ 106*)—DUTY OF ATTORNEY—GOOD FAITH.

The law requires good faith on the part of an attorney in all dealings between himself and his client.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 217, 219; Dec. Dig. § 106.*]

4. ATTORNEY AND CLIENT (§ 36*)—SUSPENSION AND DISBARMENT—GROUNDS—STATUTORY PROVISIONS.

Under Laws 1912, c. 253, amending Judiciary Law (Laws 1909, c. 35 [Consol. Laws 1909, c. 30]) § 88, relating to the power and control of the Supreme Court over attorneys, it is the duty of the Appellate Division to condemn the conduct of an attorney which tends to impair or defeat the administration of justice or degrade and impair the usefulness of the profession, and to protect the state and the public from lawyers who abuse the authority given them for private gain by imposing either upon their clients or on the courts.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 49; Dec. Dig. § 36.*]

5. ATTORNEY AND CLIENT (§ 62*)—RIGHT OF LITIGANT TO ACT IN PERSON.

The law allows a party to an action or special proceeding to appear in his own behalf and conduct a proceeding as his own counsel, and such appearance shown by the record is unobjectionable.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 17; Dec. Dig. § 62.*]

6. ATTORNEY AND CLIENT (§ 53*)—DISBARMENT—SUFFICIENCY OF EVIDENCE.

Evidence in a proceeding against an attorney *held* sufficient to support a referee's finding that he was guilty of professional misconduct requiring a disbarment.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 74, 75; Dec. Dig. § 53.*]

Joseph A. Flannery, an attorney at law, was charged with unprofessional conduct by the Association of the Bar of the City of New York. Respondent disbarred.

See, also, 135 App. Div. 918, 122 N. Y. Supp. 1128.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Argued before INGRAHAM, P. J., and LAUGHLIN, MILLER, SCOTT, and DOWLING, JJ.

William D. Guthrie, of New York City, for petitioner.

Edward W. Hatch, of New York City, for respondent.

INGRAHAM, P. J. The respondent in this proceeding was admitted to practice in November, 1895. Since his admission he has made a specialty of what are called condemnation and assessment proceedings appearing for the owners of property required by the city of New York for public purposes, and has acquired a very large and successful practice in relation to such proceedings. During the period covered by this investigation, he stated that he represented thousands of clients, and at least 90 per cent. of his business was contingent upon what he recovered for his clients from the condemnation of their property. In a large part of this business the expenses were to come out of the percentage that the respondent received, so that the client was not to be liable for any fees of experts or other disbursements. The respondent to facilitate his dealings had organized six corporations in all of which he owned all the stock which either stood in his name or the names of his clerks, and he was the sole person beneficially interested in them. One of these corporations called the Barrette Land Improvement Company had a capital of $1,000, and was organized by respondent because as he said it was the most convenient form in which to hold title to the real estate that he had purchased.

[1] When the city requires the property of an individual for a public improvement, it can only acquire such property by paying what the property owner demands or the fair value of the property as ascertained by a judicial proceeding. Where the value of the property is to be ascertained by such a proceeding, it is necessary that the owner should be represented before the commissioners appointed to determine the value of the property in order to secure a proper price for the property that the public is about to condemn.

[2] It appeared that in substantially all these proceedings the property owner has some kind of a contingent agreement with the attorney who represents him by which the amount of his fee is regulated by the amount of the award that he secures for his client. When such agreements are voluntarily made induced by no fraudulent misrepresentations or suppression or concealment of the facts which should be disclosed on the part of the attorney, they have been recognized as proper and have been enforced by the courts. The very nature of the transaction, however, imposes upon the attorney the utmost good faith in his relations with his client and in obtaining contracts. Where the question is as to the value of the property about to be condemned, which in many cases depends upon the opinion of experts rather than upon actual values proved by sales or other direct evidence, there are many opportunities for an attorney who is unscrupulous or willing to take advantage of his client to obtain contracts which provide for fees that are out of all proportion to the value of the services rendered or to acquire the property himself from

his client at a much less price than will probably be the award made for it.

[3] The only safeguard for the clients is that the attorneys are strictly held to an observance of the good faith that the law requires in all dealings between an attorney and his client, and we feel that it is only by the exercise of the disciplinary powers of this court that the rights of the public and the rights of the owners of property can be protected.

[4] A law has just been enacted which expressly throws upon this court vastly increased responsibility in its disciplinary powers over the members of the profession, which is known as chapter 253 of the Laws of 1912, amending section 88 of the Judiciary Law (chapter 35 of the Laws of 1909 [Consol. Laws 1909, c. 30]). That act provides:

"The Supreme Court shall have power and control over attorneys and counsellors at law and the appellate division of the Supreme Court in each department is authorized to censure, suspend from practice or remove from office any attorney or counsellor at law admitted to practice as such who is guilty of professional misconduct, malpractice, fraud, deceit, crime or misdemeanor or any conduct prejudicial to the administration of justice."

We are therefore charged with the duty of disciplining an attorney whose conduct has brought him within this provision. It is our duty to condemn conduct which tends to impair or defeat the administration of justice or degrade and impair the usefulness of the profession, and protect the state and the public from lawyers who prostitute the authority given to them for private gain by imposing on or defrauding their clients or the tribunals which are instituted to administer the law, and protect those whose rights and interests are committed to their care. If this country is to be governed by law, it is essential that those charged with its administration should be honest in the discharge of the duties confided to and obligations imposed upon them. We do not, however, rely on the power given by this amendment in this proceeding.

There are involved in this proceeding six separate charges against this respondent. The case has been examined with great care by the referee, and a large amount of testimony has been taken, but the main facts are not in substantial dispute. The referee has in a very careful report stated the facts as found by him, and as to each of these charges he has found the respondent guilty except as to the fourth charge, which the referee held was not proven, and which was dismissed. It is quite impossible within the limit of an opinion to analyze all the evidence taken before the referee and in view of the full discussion of the question by the referee such an analysis may be dispensed with. I will only attempt, therefore, to state the facts so far as necessary to make intelligible the conclusions at which we have arrived.

A corporation known as the East Bay Land & Improvement Company was the owner of certain real property located in the borough of the Bronx. Prior to December 18, 1904, the intention of the city to acquire this property became known, and on that day the corporation entered into a contract with the respondent by which it authorized him to represent it in the matter of the "proposed acquirement"

and to take such proceedings as he might deem advisable to obtain an award to the company for the full value of such of its property as may be taken. The respondent agreed to appear for the company and use his best efforts to obtain a full award for and no assessment against it, and to hold the company harmless from any costs against it by reason of any proceedings taken by him. In consideration of these services to be rendered, the company agreed to pay the respondent in full for his services and expenses 10 per cent. of the award received by it for damages by reason of the taking of the land, and it was further agreed that the charge of R. Clarence Dorsett of counsel for the said company were to be paid out of the fees received by the respondent. This agreement was executed by the president of the East Bay Land & Improvement Company and by the respondent. Proceedings were subsequently commenced by the city to acquire this property, commissioners were appointed on August 18, 1905, and on November 20, 1905, a claim on behalf of this company was filed by the respondent acting as the attorney for the company with the commissioners. Some time after this claim was filed and while the proceeding was pending, the officers of the company expressed a desire to sell the property. Mr. Dorsett, who was to share the respondent's fee, was a director of this East Bay Company and a Mr. Patrick was its president. According to the respondent's testimony, the first suggestion about the sale of the property was that three or four weeks before the contract hereafter referred to was signed Mr. Dorsett and the respondent talked over the possible sale of the property, and the respondent said that he might know somebody to go in with him and buy the property. Subsequently Dorsett told the respondent that the company would sell the property at $15,000 an acre, and the respondent said that day or the next day that he would take it. It appears, however, that on the 8th of January, 1906, the directors of this East Bay Company held a meeting at which a Mr. Annan, who lived in England, and who represented English stockholders who controlled the company and who was also its vice president, reported to the directors that "he had entered into an agreement with Joseph A. Flannery for the sale of certain property at Hunt's Point, and that, in accordance therewith, the company had entered into a contract with Leon A. Rains for the sale of that property on December 22, 1905," and the contract with Rains for the purchase of the property was set forth in the minutes of the meeting. Annan is dead. By this contract, which was dated December 22, 1905, the East Bay Company agreed to sell the premises included in this condemnation proceeding to Leon A. Rains at the price of $15,000 an acre, on which $5,000 in cash was paid on the execution and delivery of the contract, the balance of the purchase price to be paid in cash on delivery of the deed on the 1st of February, 1906. There was a provision in the contract to ascertain the quantity of land and amount of acreage of the property intended to be sold, and one Hellerith, a city surveyor, was to make this survey. There was no suggestion in this contract that the respondent had any interest in the purchase. The $5,000 paid on the execution of the contract was not paid by Flan-

nery's check or Rains' check, but by a check of the Knickerbocker Trust Company drawn on the National Bank of Commerce. Thus nothing appeared in the records of the transaction upon which the trustees acted that this was anything other than a sale to Rains, and, so far as the documents show, there was no indication that Flannery, the company's attorney, had anything to do with the transaction, except that the sale had been made through him. At the same time that this contract of sale to Rains was executed another contract with Flannery was executed. That contract recited the agreement of September 12th by which Flannery was to have 10 per cent. of the award received by the company for the land taken, that while the proceeding to condemn the property was pending the company had agreed to sell the land to Rains for $15,000 cash per acre, and the company agreed upon the completion of the contract to pay Flannery 10 per cent. of the total amount received by it on the aforesaid cash sale in full settlement of his claim against it under said agreement, and Flannery agreed to accept such payment in full settlement thereof. This agreement speaks in no uncertain tones as to what this corporation understood it was doing when it made its sale of the property. Flannery had had a contract to represent the company before the commission, and he was to receive 10 per cent. of the award. So far as appears, nothing had been done under the contract except to file a claim before the commissioners and the company had then agreed to sell to Rains the property that was covered by the condemnation proceedings. Certainly, if Flannery had purchased this property, or if it had been understood that Flannery was the purchaser, this form of a contract to Rains and an agreement to pay to Flannery 10 per cent. of the purchase price would have been an unmeaning ceremony. The closing of the contract for the sale of the property was extended from time to time until finally the whole amount of the purchase price, about $85,953, was paid, and on the same day, namely, April 13, 1906, the corporation paid to Flannery by check the sum of $8,-595.30 pursuant to the agreement of September 22d. Thus Flannery took the money from one hand to pay the $85,000, and received back $8,595.30 with the other under his original contract for 10 per cent. to represent the company as its attorney.

It is admitted by both Flannery and Rains that Rains was a mere dummy; that the purchase was made on account of Flannery, and Flannery alone; and, after the conveyance was taken from the company, it was conveyed to this Barrette Point Company, which was organized by Flannery to hold this property, and in which Flannery owned all the stock. Flannery then went on with the proceeding before the commission in the name of the East Bay corporation. On the 13th of April, 1906, about a week after the East Bay Company had conveyed to Rains' assignee and Rains' assignee had conveyed to the Barrette Point Company, Flannery signed an agreement with Dorsett. Dorsett was the attorney for the East Bay Company, was one of its directors, and had had to do with the original making of the contract between the company and Rains. Under the contract between the company and Flannery, the latter was to pay to Dorsett

out of his fee Dorsett's charge as counsel for the company, and Flannery then agreed with Dorsett that the sale by the East Bay Company to Rains and by Rains to McArdle "in no wise affects my agreement with R. Clarence Dorsett to pay him, for his services, one-third of all fees received by me in this matter, and I hereby agree, on receipt of said fees, to pay him one-third thereof. My agreement with the said McArdle is that I am to receive for my services in the pending condemnation proceedings 15 per cent. of the difference between the award made for the property and the sum of $85,953 paid therefor." · We have here another fact which is inconsistent with the claim that the corporation and its directors understood that the real sale was to the respondent. In none of these instruments executed at this time is there a word of Flannery's being interested in the purchase. The whole transaction is one of a sale by the company to a third party procured or introduced, it is true, by Flannery, and Flannery's connection with the transaction is upon the record carefully concealed. The respondent does not claim that it was known by the directors or officers of this company or that he frankly stated to them that he alone was purchasing the property. He says that he stated all the facts to Mr. Annan, although here he does not attempt to state in · detail what all the facts included. What Mr. Annan thought of the transaction is evidenced by his letter of December 19, 1905, to the secretary of the English Company. He there states that this sale of the 4½ acres was a cash sale "to a nominee of the politicians in touch with the powers that be in this city. * * * I (Mr. Annan) have considered it prudent to let this sale go through, as I want the parties to whom we make it, ultimately to arrange with the city to buy the whole of the remainder of the Hunt's Point property for a public park." Flannery's testimony as to what he said to Mr. Annan depends upon his own uncorroborated statement, and Mr. Annan is dead. It is somewhat peculiar that the only one to whom he claims to have made any disclosure of his interest in the purchase was to a man who cannot contradict him.

But there is another fact that is undisputed, and which is entitled to considerable weight in determining the question of these charges. This contract to purchase was made on the 22d of December, 1905. The purchase was to have been completed on the 1st of February, 1906, but the completion was adjourned from time to time until April. On the 1st of February Flannery called as a witness, not on his own behalf, but on behalf of the corporation, and while he was acting on the record as its attorney, a Mr. Hotaling as an expert to testify as to the value of this property. Although Flannery had in his pocket a contract for the purchase of the property for $85,000, this witness testified that in his opinion the property was then worth over $206,-000. Flannery then certainly knew the value that his expert had placed upon the property. He swears himself that he was entirely familiar with the value of property in this locality, and was perfectly familiar with the proceedings before these commissioners and the methods by which they made their awards. It certainly cannot be assumed that he·introduced this witness and allowed him to swear to

that value without believing that the property was actually of the value that this witness testified to. He admits that he made no disclosure of the fact of this valuation to his client, although at that time the contract had not been completed. He thus, acting for his client and in their name, introduced evidence to show that this property was worth nearly three times what he had agreed to pay his client for it, but concealed that fact from them. The relation of attorney and client still existed, for under this supplemental agreement he was to receive 10 per cent. of the price that he himself was to pay to his client for the property, and he still assumed to represent it before the commission. And the further fact is established by uncontradicted evidence that this expert that Flannery had produced to testify as to the value of the property for which he had a contract of purchase was asked by the representatives of the city on cross-examination: "You do not know of any sale of unimproved water front property in this immediate neighborhood?" To which the witness answered: "There has been none. Q. But there have been no sales of unimproved property in the neighborhood of Hunt's Point?" To which the witness answered: "No, sir." The respondent knew there had been a sale for he himself had purchased it and had a contract for the sale of this property, yet he allowed his own witness to testify to this fact without informing either the witness or the commissioners that the testimony was false, that there had been a sale of the property and that he had purchased it, and the respondent did not have in this case the interest of his client to protect but he was his own client, and the award would go into his own pocket. We have expressed our opinion as to the propriety of a member of the bar allowing untrue testimony to be given by a witness called by him when he knew it was untrue without acquainting the court of the fact that it was untrue. See Matter of Hardenbrook, 135 App. Div. 634, 121 N. Y. Supp. 250, affirmed 199 N. Y. 539, 92 N. E. 1086; Matter of Schapiro, 144 App. Div. 1, 128 N. Y. Supp. 852. The respondent continued to conduct this proceeding in the name of his client without a suggestion that the situation had changed, or that he had become the owner of the property until he finally succeeded in obtaining from these commissioners an award of $247,000 for the property for which a few months before he had paid but $85,000, collected that money from the city and applied it to his own use. The referee has discussed all the facts in relation to this transaction, and it is unnecessary for us to refer to them at greater detail. We can only say that we concur in his conclusion that, upon the facts stated in his dealings with his client, the said East Bay Land & Improvement Company, the respondent was guilty of unprofessional conduct and culpable omission of duty.

The second charge upon which the referee has found the respondent guilty relates to the purchase by him of the premises No. 46 Forsyth street, while that and adjacent premises were in process of condemnation by the city for a school site. A proceeding to acquire this property was instituted by the city in October, 1904. The premises No. 46 Forsyth street were owned by Townsend Scudder and

Philemon H. Scudder as trustees. On December 3, 1904, they appeared in the proceeding, and made proof of title by Mr. Kellogg, their attorney. On January 11, 1905, the Scudder trustees contracted to sell this property to one Gribbon, Jr., for $31,000, subject to a lease for 20 years and certain taxes, etc. This property was in reality purchased for the respondent; Gribbon being a clerk in his office, and having no interest in the property. This purchase was completed on February 8, 1905, when the respondent paid the balance of the purchase money, and took a deed of the property to Gribbon. This lease had been valued by experts before the commissioners at $2,500, but on May 23, 1905, after the respondent had acquired. the fee of the property, he also purchased this leasehold, paying $4,300 for it, and taking an assignment thereof in the name of one Cohn. The respondent conducted the further proceedings as to this property before the commission, and induced Kellogg, who had been the attorney for the trustees, not to prove the mortgage that the respondent's nominee had given for the balance of the purchase price, writing to Kellogg that he had not filed the deed of his client, his own nominee, with the commissioners, and did not wish to do so until the preliminary report was filed, and therefore preferred that Kellogg would postpone his proof of the mortgage until after that time. Thus by keeping this deed from the record the respondent got an award of $31,908 for the property for which he seems to have paid $31,000; and he also got an award for the value of the lease of $11,591.90 which he had purchased for $4,300. After this award was made, the respondent in the name of the trustees filed an objection to the awards which were verified by one Tobias, a clerk in the respondent's office, the respondent owning both the fee and the lease, although the facts had been concealed from the commissioners. This charge might not be serious if standing alone, but it is relevant in connection with the other charge, as indicating the methods adopted by this respondent in purchasing property under condemnation, and then conducting the proceedings in the name of the former owners, and using that relation to obtain for himself an increased award.

The third charge passed upon by the referee related to the purchase by the respondent of a piece of property known as No. 55 Eldridge street, which was also in course of being condemned by the city for school purposes. This property was owned by an estate, and was purchased by one Helen Richardson by contract executed on June 28, 1904, for the sum of $40,000, $20,000 to be paid in cash and $20,-000 subject to a mortgage. Helen Richardson was a stenographer employed by the respondent, and it is conceded that she was a dummy for him, he being the only party in interest and furnishing all the money with which the purchase was made. On December 1, 1904, after a purchase had been consummated, it was entered on the record that the respondent appeared for the testatrix from whose estate he had purchased the property. The respondent states that this appearance was made by one Falconer, who was a clerk for him, but without his authority. No attempt was made to prove the title in Helen Richardson, and the respondent never proved title in her. The

commissioners awarded for this property $51,600 to Therese Friedman, the owner, although she was dead and Helen Richardson held the title to the property for the respondent. This report was confirmed. Subsequent to the confirmation of this report the respondent applied to this court by a petition which alleged that the commissioners had erroneously made the award to Mrs. Friedman, and that the award should be made to the respondent and set up on that application the deed of the Friedman executors. A referee was appointed, but the proceeding was not further continued, and the respondent subsequently obtained an order of the Special Term on the written consent of the corporation counsel amending the report so as to ·direct the $51,600 to be paid to the respondent's nominee, and finally got a payment of that award from the comptroller. This charge also would not of itself be serious, but it illustrates the methods of the respondent in these proceedings.

The fourth charge was dismissed by the referee, and to that no attention will be paid.

The fifth charge of which the referee finds the respondent guilty is quite characteristic of the methods that are adopted to increase awards from the city for property taken. This charge related to a proceeding which was instituted by the city in October, 1904, and commissioners of estimate and appraisal were appointed by order entered November 23, 1904. The Cammann heirs owned 48.74 lots, 21 lots of which were included in the property to be taken, to partition which an action had been brought in the Supreme Court, in which on August 10, 1904, an interlocutory judgment in partition had been entered, but the property had not been sold. On March 14, 1905, William C. Cammann, as attorney for the Cammann heirs, proved their title to the 21.46 lots which were to be taken by the city for a bridge over the Harlem River, and on April 1, 1905, the title to these 21 lots had vested in the city under a resolution of the board of estimate and apportionment. Just before the 1st of May, 1905, · the respondent made to a real estate broker an offer for the remaining lots not included in the portion the title to which had vested in the city. Acting on behalf of the Local Realty Company, one of the corporations organized by the respondent for transactions of this character, this broker opened negotiations with Mr. Cammann for the purchase of the 27 lots. This resulted on the 5th of ˙May in a contract between the Cammann heirs and the Local Realty Company for the purchase of these lots. This contract recited the entry of the judgment in partition, and the Cammann heirs agreed to cause the referee named in such judgment to advertise and offer for sale to the highest bidder on or before June 1, 1905, the portion of the plot of 48 lots which was not included in the part the title to which had vested in the city; that plot consisting of 27.28 lots. The contract then provided that this Local Realty Company would bid at such sale, and, in the absence of any higher bid, would purchase these 27 lots for the sum of $95,832 of which it was˙to pay $5,000 upon the execution and delivery of the contract, 10 per cent. of the purchase price at the time and place of sale, and the remainder or $81,000 on

the delivery of the referee's deed on or before August 7, 1905. There was then a recital in the contract that the Cammann heirs had owned other premises, the title of which had been acquired by the city, and the Cammann heirs then agreed, upon the full completion of the purchase by this Realty Company as provided for in the contract, that they would sell, assign, transfer, and set over to the Realty Company all their joint and several right, title, and interest in and to any claim or right they or any of them had or may have in and to any award or awards which had been or which may thereafter be made to them or any of them out of the condemnation and taking of said lots the title to which had before vested in the city of New York. The amount to be paid seems to have been determined by the price that some railroad company had paid for lots in that neighborhood, which was between $1,600 and $2,000 a lot, and it was finally agreed that the respondent should pay for the 27 lots at auction the sum of $1,-980 a lot for the whole 48 lots. This was quite an ingenious scheme. The respondent would really acquire the title to 27 lots in fee and the right to an award for 21 lots which had vested in the city of New York, but he would bid $95,832 for the 27 lots alone, suppressing the fact that he really acquired for that sum 48 lots. The price paid for these 27 lots at public auction would be very convincing proof before the commissioners that the 21 lots which had been acquired by the city were worth the same price per lot that this Realty Company had been willing to bid at auction for 27 lots. The respondent testified that he understood that he purchased 27 lots at the auction for $95,832, and that he got the award as a bonus for the bid. This proceeding was carried through exactly as the respondent had calculated. The contract was signed on May 5, 1905, and the respondent through one Brown, a broker, paid the $5,000 to be paid on signing the contract. On May 8, 1905, the property was advertised, and on May 31st it was bought at the sale. The lots described in the sale were the 27 lots not taken by the city. There was no suggestion in the notice of sale or the terms of the sale that the purchase of these lots would carry with it any award that would be made against the city. At the auction sale but one bid was made, and that was for $95,832, in the name of one Laura Dean, and she bought the property on behalf of this Realty Company, of which the respondent owned all the stock, and she made that bid at the respondent's request. Ten per cent. of the purchase price was paid by a check of the Local Realty Company, and the Cammann representative was notified that this bid was on behalf of the Realty Company pursuant to the contract, and had been assigned to the company. The Local Realty Company then assigned its title and interest in the bid to the Fordham Dock Company, another of respondent's thousand dollar corporations of which he owned all the stock, and on the 17th of August, 1905, the referee delivered a deed of the premises sold which was 27 lots, and the balance of the purchase money was paid by a check of the Knickerbocker Trust Company; the remaining balance of the purchase price being secured by a purchase-money mortgage on the premises. All of the money required to carry out this pur-

chase was furnished by the respondent. In neither the deed nor the mortgage was any reference made to the award. The proceedings to determine the value of the property acquired by the city proceeded before the commissioners who made their award on December 21, 1905, awarding as damages for the Cammann lots taken by the city the sum of $115,000, the report stating that this award had .been assigned to the Fordham . Dock Company subject to a mortgage to the Cammann heirs.

The object of all this performance will appear when the proceeding before the commissioners is related. When this original contract of May 5th was made, no attempt had been made to prove the value of the 21 lots taken by the city, but the respondent procured an agreement by which the Realty Company was to conduct under the name of the Cammann heirs, but at its own cost and expense, the said proceedings, and to adduce and. offer, such evidence before the commissioners as to the value of the said property as should be proper and advisable. Mr. Flannery, being all of the Realty Company, selected himself as its attorney, and Mr. Cammann approved that choice, and appeared before the commissioners, and stated that the respondent was associated with himself as counsel for the Cammann claimants, and thereafter the respondent took entire charge of the proceedings, and the Cammann interests dropped out. On May 10th, the respondent produced the Mr. Hotaling, who was his expert in the other cases, who valued the whole 48 lots at $207,145, the 27 lots at $115,940, and the 21 lots taken by the city at $91,000, being $4,250 a lot. He subsequently changed his testimony so as to increase the respondent's corporation's claim for 21 lots taken to $114,-393. On the examination of Hotaling, he was asked whether he knew of the Cammann estate sale, and that these 27 lots then sold for $95,-832. Hotaling in giving this testimony had been kept in entire ignorance of the agreement with the Cammann heirs by which this award was to be paid to the respondent, and assumed that the price of $95,-832 had been actually paid for 27 lots. The respondent was present and heard his own witness give this testimony, and made no statement at all to the commissioners or to the witness that the property purchased by this sum of $95,832 had included the award, but allowed the testimony to go before the commissioners as indicating the price per lot as fixed by the witness. Berrian, the auctioneer who conducted this sale, was examined on the 5th of June, a week after the sale as an expert for the city. He was asked about this auction sale, and whether he had sold the remainder of the tract at auction in partition, to which he said, "Yes," that these lots at auction brought about $3,500 per lot. The witness was then asked by the respondent whether the auction sale was a partition sale, and whether a partition sale at public auction was not generally regarded as a very severe test of the value of property, to which he replied "In some cases, yes, sir; in other cases, no. I should say that that was the fair price of the property." He was then asked whether he had taken this sale on the 31st of May into consideration in determining the value, to which he said: "I certainly have; yes, sir," and the respondent

then asked: "So that, as the chairman says, the sale had a favorable influence on your mind? A. It must have had. I made the sale, and I saw the money paid for it. I could'nt have ignored that sale." The question of the value of the property was submitted to the commissioners on the testimony of these two experts. From their testimony it clearly appears that both witnesses assumed that that was a bona fide sale at which 27 lots brought $95,832, and from both the witnesses and the commissioners was concealed the fact that the respondent had purchased the property and as part of the purchase had also obtained whatever award was made in the proceeding then being conducted. The explanation of the respondent as to his action in this regard is absurd. Subsequently the commissioners awarded to the Cammann heirs $100,000 for the 21 lots, which was objected to by the respondent's assistant on the ground that the award was insufficient and inadequate. Subsequently, and on October 19th, the respondent's associate offered in evidence the assignment of the award made by the commissioners to the Fordham Dock Company, not the company in which the ownership of the 27 lots stood, and nothing appeared in that assignment to indicate even at that time that the award had been assigned as part of the purchase of the 27 lots for $95,832. There was no reference in this assignment to any partition sale, auction sale, or any transaction between the parties except the transfer for an expressed consideration of one dollar of the individual shares of the various parties entitled to the award. The respondent then produced a new expert who raised the price of the lots to $5,500 per lot, but nothing was said to this witness about the circumstances under which the award had been transferred. The commissioners finally awarded $115,000 for the lots taken by the city for which the respondent had actually paid nothing according to the record, and the respondent finally got from the city on account of these lots $121,900.

In summing up his conclusion as to this charge the referee says:

"It may fairly be charged against the respondent that he knew that Berrian was testifying in respect of the 'lot price' brought at the auction sale in total ignorance of the existence of the agreement. It was not his right, certainly not his moral right, to take advantage of that ignorance and bring out testimony which he knew to be untrue, and the effect, if not the purpose, of which was to mislead and deceive the commissioners who were to sit in judgment upon the value of his property."

There is one other charge which the referee considers which relates to the·purchase by the respondent from one Phœbe J. Leask while employed and acting as her attorney of a parcel of land situated in the city of New York which the city was acquiring for park purposes. This proceeding was pending in December, 1905, and commissioners had been appointed to estimate the value of the land acquired which included that owned by Phœbe J. Leask. Mrs. Leask employed the respondent in October, 1905, to act as her·attorney in the proceeding in respect to a parcel of land owned by her. While this proceeding was pending, the respondent purchased the parcel from Mrs. Leask, taking the title in the name of one Walter for $7,500, and on February 14. 1906, Mrs. Leask conveyed the said parcel to

Walter, who seems to have paid $2,000 in cash, and gave back a purchase-money mortgage for $5,500. Walter was in the respondent's employ, and took title and made the mortgage solely as the agent and for the benefit of the respondent. The price actually paid was not $7,500, but $7,000, although the conveyance recited that it was $7,500. Immediately after Walter acquired the title, he conveyed it to this Local Realty Company, which was owned by the respondent, and the Local Realty Company thereupon presented to the commissioners a claim for the value of this property; the respondent appearing as its attorney. Subsequently the Local Realty Company was awarded by the commissioners $12,647.80, which report was confirmed November 14, 1907, and the award was subsequently collected by the Realty Company and appropriated by the respondent. This purchase was made from Mrs. Leask's representative by Rains, who had been the original grantee in the property taken by the respondent in the first charge. Rains testified that he did not inform Leask that Mr. Flannery, Mrs. Leask's attorney who was acting for her, had any interest in the purchase, and that Mrs. Leask had no knowledge of that fact until the mortgage was finally paid. The respondent testified that he told his clerk Rains to tell Mrs. Leask that he was purchasing the property, but if he told him so, which Rains denies, certainly the client was never informed of the fact and the contract which the respondent caused Walter, the purchaser, to execute provided that the purchaser would assume the contract of retainer made by the seller with the respondent to act for her as her attorney in the condemnation proceedings for park purposes relating to the said property. That on its face was a direct statement that the respondent was not the purchaser, but the purchaser assumed the contract of employment of the respondent.

The referee finds that every step taken by the respondent to acquire this property served to conceal his interest in the transaction, whether he so intended it or not. Certainly so far as the proof shows the only person who knew that he was the real purchaser was Rains. The referee further holds that it was the duty of the respondent before he purchased his client's property to at least inform her of the value of this property, and that she was selling it to him at a lower price than was justified.

[5, 6] I have thus stated the main facts upon which the referee has found that the respondent was guilty of unprofessional conduct. The evidence, as before stated, is very voluminous, and it has been impossible to further state the facts upon which the referee acted, but a consideration of all the testimony requires us to agree with his conclusions and confirm his report.

The main fact which stands out in this whole investigation is that it never seems to have occurred to the respondent that there was any impropriety in his acquiring from his clients their property that he was employed to preserve and protect, or that the respondent was under any obligations to his clients, when he wished to purchase their property, to state that he was himself interested in the purchase, and that it was made on his behalf. He took the titles in the name of

his dummies without disclosing the fact that the dummies represented him or that the dummies were his clerks or associates, and then continued to conduct the proceeding for the valuation of this property in the name of his client, suppressing from the commissioners and the experts who valued the property the fact of the purchase and all facts within his knowledge that would affect the value of the property. Nor does he seem to have realized in the slightest degree that he had any duty to perform in proceedings before commissioners to state the facts to the experts who were called to appraise the property, but allowed both his own experts and the experts for the city to estimate the value of the property upon the assumption of facts which he knew to be false without correcting the mistake or indicating in any manner that the experts were in error as to the basis upon which they made their estimate. The duty of the respondent, as before stated, was not at all complicated by any feeling of a duty to a client, for in each of these cases, while assuming to act for a client, he was in reality acting for himself, and the benefits accrued to him by this suppression of information and the mistakes of witnesses in their testimony as to the facts and for his own benefit. It is true that the law allows a party to an action or special proceeding to appear in his own behalf and conduct the proceeding as his own testimony or counsel, and, when that fact appears upon the record, it is unobjectionable; but when an attorney commences a proceeding in the name and for the benefit of a client, and then pending the proceeding acquires the client's interest, so that he is no longer representing a client, but is representing himself, he certainly should be held to strict rules as to the giving of false testimony or calling witnesses to give false testimony knowing it to be false and relying upon it to secure to himself an advantage, which, but for such testimony, he could not have secured. This is emphasized by the Cammann Case, which involved one of the charges to which attention has been called. Here the respondent had acquired 48 lots of land for $95,832. The form in which he arranged the sale to take place indicated that he had paid that sum for 27 lots, instead of 48 lots. He called a witness who bases his estimate upon the fact that a third party had been willing to purchase those lots at public auction at the price named, and he allows the witness to testify that in fixing the value of the property taken he took into consideration the fact that for 27 lots a purchaser had been willing to give at public auction $95,832. There was not a suggestion made to the commissioners by the respondent that the purchaser had acquired anything else except the 27 lots by the payment of that amount of money, and yet all this time the respondent had in his pocket a contract by which he was to receive the very award which was then the subject of investigation in addition to the price that he had paid for the lots. And this was not for the benefit of a client, but for his own personal gain. What is really the case here is that this respondent has endeavored to unite the profession of the practice of the law with the business of a speculator in real estate purchasing property which was subject to condemnation or about to be condemned. He has used his position as an attorney to

assist him in acquiring these properties, has used his position as an attorney and his relation to his client to the distinct detriment of his clients and to his own advantage, and, when called to account for his actions, without expressing the slightest appreciation of the inconsistent positions that he has occupied and his duty to his client, the court, or the commissioners, he boldly attempts to justify his proceedings, and claims that it is without criticism. The respondent is not an inexperienced young man struggling to make enough for his own support, but a successful lawyer with a large practice representing thousands of clients who have intrusted their affairs in his hands. It seems to me that the whole evidence of his methods, his treatment of his clients, the means adopted to conceal what he has done, and the conception that he has of his professional obligations and duty both to his clients and the court require the severest condemnation, and that he should be disbarred; and it is so ordered.

LAUGHLIN, SCOTT, and DOWLING, JJ., concur.

MILLER, J., taking no part.