COSIMO TRICANO, Plaintiff, *v.* CONEY ISLAND AND BROOKLYN RAILROAD COMPANY and Another, Defendants.

In the Matter of the Substitution of Attorneys for the Plaintiff in the Above-entitled Action.

COSIMO TRICANO and RUGER BROTHERS, Attorneys, Appellants; LEVY & BECKER, Attorneys, Respondents.

First Department, May 29, 1925.

Attorney and client — substitution — attorneys' lien in negligence action — evidence shows that plaintiff in action never retained original attorneys to commence action — order confirming report of referee that attorneys were retained and that they should have lien on suit is reversed.

In proceedings for the substitution of attorneys for the plaintiff in a negligence action and to fix the lien of the original attorneys, the evidence shows that the plaintiff never retained the original attorneys to commence the action, and, therefore, the order confirming the report of the referee to the effect that the original attorneys were retained by the plaintiff and that they had a lien on the action in the amount of $750 is reversed.

APPEAL by Cosimo Tricano, plaintiff, and Ruger Brothers, attorneys, from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 2d day of February, 1925, confirming the report of an official referee appointed to take proof and determine whether Levy & Becker, attorneys, respondents, were employed by the plaintiff to institute an action for him, and if so, the value of any services rendered.

*Ruger Brothers* in person [*Adolph Ruger* of counsel], for the appellants.

*Levy & Becker* [*Joseph Levy* of counsel; *Morris E. Packer* with him on the brief], for the respondents.

FINCH, J.:

The plaintiff was injured through the negligence of the Coney Island and Brooklyn Railroad Company. The respondents commenced an action on his behalf. Thereafter Ruger Bros., another firm of attorneys, applied for an order vacating the summons and complaint served by the respondents, or in the alternative dismissing the action. It appearing that the action was commenced under the alleged authority of a written retainer signed by the plaintiff, the motion was denied, without prejudice to a motion for substitution

of attorneys. Such a motion was then made and granted, the respondents given a continuing lien upon the plaintiff's cause of action and any settlement or recovery, in an amount to be thereafter fixed by the court, and the case referred to an official referee to take proof as to the manner and under what conditions the retainer was signed, in order that the court might determine whether or not a contract actually was made. The referee reported in favor of the respondents and fixed the value of the services rendered at $750.

The respondents' case rests chiefly upon the testimony of one Sagona, who procured the written retainer upon which the respondents rely. Also, no claim to the execution of a retainer is made except upon one authorized by the plaintiff almost immediately following his being brought to the hospital and signed by him that same afternoon. A reading of this record shows that the testimony of Sagona is brazenly and deliberately false in so many important particulars as to vitiate his testimony as to the procurement of the retainer, and to set aside a finding that the same was signed as a retainer by the plaintiff, on the ground that it was against the weight of the evidence. Sagona testified that his business was that of an investigator and that he was already at the hospital before the plaintiff arrived, investigating a similar case. The police blotter shows that the accident happened at one-forty. The plaintiff's sister testified that she, came to the hospital to see her brother and that Sagona arrived about twenty minutes thereafter. According to the testimony of Sagona, he was at the bedside of the injured man at two o'clock. The doctor who brought the injured man to the hospital in the ambulance testified that he had seen him within almost an hour after the accident. The testimony of the doctor would not bring the injured man to the hospital until almost three o'clock; but whatever time the injured man reached the hospital, certain it is that Sagona was there and met him on his arrival or within a very few minutes thereafter. Sagona's testimony as to how he met the injured man is that the sister came to the hospital and was " a bit bewildered and did not know what was what, and talking in Italian and I simply volunteered to ask her what I could do for her," and that she then asked Sagona to ask the doctor what the injuries were, in other words, to translate to her what happened to her brother. The testimony as to how Sagona came to meet the injured man, namely, through volunteering to help the sister, who could not speak in English, is false, for the reason that the sister appeared at the hearing and had no difficulty in testifying both on direct and cross-examination in English. Sagona further testified that

he thereupon engaged the injured man in conversation, and that the injured man asked him if he could not get him a good lawyer and said to him that he wished he would get him a good lawyer and also go and see his wife at her home. While this testimony does not appear as certainly false as that already alluded to, yet the facts are that this man was suffering from a compound com- minuted fracture of the bones of the leg, and the doctor at the hospital testified that such an injury occasions a bad shock, which the doctor estimated with proper medical care would be over in a half or three-quarters of an hour. The sister testified that at this time the plaintiff was in so much pain that he was tearing the sheets with his hands. That the plaintiff would at such a time immediately ask Sagona for a good lawyer and also ask him to go and see his wife at her home is most improbable. The sister testified that Sagona came in and when the injured man asked who he was, " He said: ' I am the doctor.' At that time he said to me: ' Who are you? ' I said: ' I am the sister.' He said: ' I am the lawyer and I want to take care of this suit.' I said: ' My brother cannot talk now. Wait a little while.' He said: ' No I want to take it now.' He said: ' Where is the wife? ' I said: ' My sister-in-law is sick, they have a baby on the 17th.' He said: ' Can I speak to the wife? ' They come home; my sister-in-law is in bed —. Q. Did he go home to your sister-in-law's house, your brother's house, right then? A. Yes, right away. Q. Did you go with him? A. Yes. Q. You went from the hospital to your brother's house with Sagona? A. Yes, sir. Q. And then what, when you got to your brother's house? A. My sister say: ' I cannot say anything now until I am better.' Q. What was the matter with your sister? A. My sister, she had a baby; she on the 17th had a baby and my brother was on the 18th hurt. * * * Q. She said she couldn't talk about the case until she was better? A. She said: ' I cannot say anything now.' "

Sagona, on the other hand, testified that immediately following his authorization by the plaintiff he went downtown to the office of the respondents and obtained their form of retainer, and then went back to the home of the plaintiff, and that the retainer was signed close on to five o'clock. If the man was not injured until one- forty and reached the hospital about three o'clock and the retainer was signed at five o'clock, during which time it is conceded that Sagona went to the home of the plaintiff and interviewed the plaintiff's wife, and then took the sister and the nurse of the plain- tiff's wife back to the hospital and had the retainer signed, there would hardly be sufficient time for him to take the trip to the respondents' office at 27 William street, Manhattan, since both the

hospital and the home of the plaintiff were in Brooklyn.  Sagona testified that he took the sister and the plaintiff's wife back to the hospital and that the retainer was executed under the following circumstances:  " Q. Tell us just what you said to him on that point?   A. I told him that they would take the case on a fifty per cent retainer.   He said: ' Yes, I know that, that is customary for any lawyer to take a case on a fifty per cent retainer,' and after reading it to him in Italian and reading it in English to his wife, he signed it and she approved of it."   This is deliberately false, since it is conceded without contradiction that the wife had been confined on the day previous to the accident and was not able to leave the house for seven days.   That Sagona deliberately testified falsely as to the presence of the plaintiff's wife, without inadvertence or mistake, appears from his further testimony: " Q. And did you actually see him sign his name on the retainer there?   A. Oh, yes, yes, surely; he was sitting up in bed, and I thought he could understand English, but he didn't; but I read it thoroughly in Italian to him, and his wife read it also, and she said: ' Yes, that is perfectly all right, and that is the kind of retainer we signed when the little boy, our little boy, was killed, the same thing.' "   With the exception of the doctor who testified to an alleged admission made to him on the part of the plaintiff that he had engaged the respondents, and that plaintiff inquired whether the doctor knew them, Sagona is not further corroborated.   The plaintiff testified, on the other hand, that he had not signed a retainer, but that all he had signed some time later at his home was what he thought to be a receipt for some small sums of money pressed on him by the respondents' firm. Plaintiff's testimony that he had signed no retainer at the hospital is corroborated by the sister and also by the nurse of the wife of the plaintiff, who had accompanied the sister to the hospital, and who both testified that no retainer was signed while they were there.   The plaintiff's story is also corroborated by the circumstances that persons in the employ of the respondents continued to press small sums of money on the plaintiff, and sought in other ways to ingratiate themselves with the plaintiff and his family, telling the plaintiff, among other things, that he would receive large amounts of money in the action, and that he then could repay any such sums of money as he had received from them.   It also appears that the respondents served an unverified complaint in the action after they had concededly received a letter from the plaintiff, asking them to do nothing further in the action, and after the plaintiff had repeatedly refused to verify the complaint at their request.

It follows that the order appealed from should be reversed,

with ten dollars costs and disbursements, and the motion to confirm denied, with ten dollars costs, and the alleged attorneys' lien vacated.

CLARKE, P. J., DOWLING, MERRELL and McAVOY, JJ., concur.

Order reversed, with ten dollars costs and disbursements, and motion denied, with ten dollars costs, and respondent's lien vacated.