In the Matter of AARON M. BECKER, an Attorney, Respondent.
In the Matter of JOSEPH LEVY, an Attorney, Respondent.

First Department, April 11, 1930.

*Isidor J. Kresel* of counsel [*H. Bartow Farr* with him on the brief], for the petitioners.

*Harold R. Medina* of counsel [*James J. Regan* with him on the brief; *Medina, Sherpick & McKee*, attorneys], for the respondents.

DOWLING, P. J.   Respondents Aaron M. Becker and Joseph Levy were admitted to practice as attorneys and counselors at law in the State of New York at a term of the Appellate Division of the Supreme Court of the State of New York, First Department, the former on February 20, 1905, and the latter on November 21, 1904.

The respondents have been engaged in the practice of the law as partners under the firm name of Levy & Becker. Separate petitions were filed against them but the charges of misconduct as an attorney at law against each of the respondents are identical and the proceedings have been conducted jointly. The respondents were charged with professional misconduct in the general solicitation of retainers in negligence actions and specific instances of solicitation were enumerated; and, in refusing to answer questions in the "Ambulance Chasing Investigation" before Mr. Justice WASSER-VOGEL, thereby hindering and delaying the conduct of the investigation. After respondents answered, the matter was referred to a referee to take testimony in regard to the charges and to report the same with his opinion. The learned referee has duly reported and petitioners now move that respondents be adjudged guilty of professional misconduct as charged in the petition and for such further action as the court may deem proper.

Upon the general charge of solicitation the record discloses that prior to April, 1924, the practice of the respondents consisted of freight claims for loss and damage of personal property in transit, the defense of various insurance companies in actions and claims asserted against them, and some commercial business, contracts and preparation of wills, some small corporation work, and some few negligence cases. In April, 1924, Abraham Gatner entered the employ of the respondents. Gatner's testimony is that respondents expressed the desire to build up a negligence business. He was "taken on" under an arrangement by which he was to receive $100 a week drawing account and a percentage of the business brought in; that following a conversation with the respondents as to the best method of building up the business he, with their full knowledge, consent and approval, employed the best known ambulance chasers "in the game," among whom were Tony Sagona, Dave Schaeffer, Eddie Ellenbogen, the two Feinbergs, Irving Wolf, Sam Abrams, Max Corbin, Joe Rose and Ben Roman; and that he arranged for their compensation in fixed amounts varying from $150 to $250 a week. He described in detail how these men worked. The whole field was systematized: Schaeffer and Wolf worked as a team in Brooklyn, which was the territory assigned to them; William Feinberg and Corbin worked in Manhattan; Ellenbogen and Rose in the Bronx and the upper part of Harlem;

Abrams and Henry Feinberg worked along the waterfront among the stevedores and longshoremen; Sagona worked primarily on Italian cases. The payroll expenditures, largely for these men, from the time of Gatner's employment to January 5, 1925, amounted to $17,545, according to a memorandum that respondents' bookkeeper gave him. A press clipping bureau was also paid to furnish a daily report of accidents.

Respondents admit that Gatner was employed to take charge of, and to manage, a negligence department at a salary of $100 a week. Their explanation is that Gatner represented that he had had experience in handling negligence cases; that he was well acquainted among lawyers who made a specialty of handling negligence cases; that he was well acquainted with insurance companies in the city, and that he knew from experience that a great many of these lawyers do not try their cases themselves but employ counsel and he stated that by reason of this acquaintance and his knowledge he thought he could succeed in diverting a large amount of this business to respondents. His duties were in general to handle such negligence cases as respondents might have in their office and see if he could develop the contracts which he claimed to have.

Gatner's activities were so successful that from June, 1924, to February, 1925, 180 negligence cases came into respondents' office. None of these was counsel work. The retainers were direct from the injured claimants, and in twenty-nine instances the retainers were signed the same day, or the day following, the date of the accident, as shown by the retainers. Neither of the respondents, nor the employees concerned therewith, could satisfactorily explain how the retainers were received. Levy claimed to have no knowledge of any case until it was reached for trial; Becker said he rarely passed on the retainers; Winkelman said he only passed on them when they were signed in the office, and Sullivan said Gatner gave him seven out of ten of the retainers.

That respondents were successful cannot be questioned. Levy said he did not know within $50,000 a year what his income was. Becker was unable to produce copies of his income tax returns.

Respondents attribute the sudden growth of their negligence business to recommendations from delegates of the Longshoremen's Union and personal friends, and to satisfied clients who benefited by substantial verdicts and substantial settlements. Respondent Becker mentioned a number of cases in which such verdicts and settlements were obtained. Of these, the Massaro case was settled on November 20, 1924, and the Dobrich case in January, 1925. The delegates from the Longshoremen's Union, with one exception,

denied they had recommended cases to respondents; one delegate said it was contrary to the by-laws to recommend a lawyer; the one delegate who testified that he recommended cases said he did so on the strength of the verdict in the Fives case. This Fives case was not tried until April, 1925. The retainers signed the day of the accident or the day following the accident were hardly obtained as the result of recommendation. This attempted explanation on the part of the respondents is not satisfactory.

Respondents admit that Gatner presented to them the various individuals whom Gatner claimed he had employed as runners, but, respondents testified, they were introduced as employees of other lawyers who would be expected to persuade their employers to employ respondents in counsel work. There were introduced in evidence two post cards sent by respondent Becker to Gatner. These cards read as follows:

"Saratoga Springs, *July* 20, 1924.

" Mr. A. Gatner,

" 27 William Street, c/o Levy & Becker,

" New York City.

" Grand Union Hotel, Saratoga, 7 22.

" Dear Gatner.— Arrived Albany Sunday night reached here Monday morning. Clear weather. Feeling a little better. Hope all the boys are hustling. Leave . here Friday. Regards to Schaeffer, Tony, Ellenbogen, Rose, Ben R., Nathan and yourself.

" A. M. B."

and

" Atlantic City, *January*, '25.

" Dear Abe.— Having wonderful weather here and no snow. The rest is very refreshing and is doing me much good. Called on Judge Friedlander today at the sanitarium. He has been quite sick. Hope everything running smoothly and much new biz. Regards to all.

" A. M. B.

" In care of the Breakers."

Becker says he merely copied the names mentioned in the first card from a letter which he had received from Gatner; that when he received the letter he assumed the names referred to some of the men whom Gatner had introduced as being connected with other law offices, and so he sent them his regards. The Tony referred to in that post card is Tony Sagona, to whose activities and his relations with respondents this court found occasion to refer in the case of *Tricano* v. *Coney Island & Brooklyn R. R. Co.* (213 App. Div. 268); in that case Sagona testified he got the case for respond-

ents from the injured plaintiff in the hospital. The Appellate Division in the Second Department, in a recent disciplinary proceeding (*Matter of Dolins*, 227 App. Div. 747), referred to Sagona as " a well-known ' ambulance chaser.' "

Before the referee it was developed that Gatner in 1916 pleaded guilty to attempted grand larceny on three indictments. We accept respondents' testimony that at the time they engaged Gatner early in 1924, they knew nothing about his criminal record. They, however, in the fall of 1924, were fully acquainted with the details of his history prior to their employment of him. He was not discharged. Their explanation that he was retained in their employ because they yielded to his importunities and the pleas of one Mr. Deutsch is not convincing. In January, 1925, he was " Dear Abe " to respondent Becker, and he enjoyed the latter's confidence to the extent indicated by the post card from Atlantic City, on which Becker wrote: " Hope everything running smoothly and much new biz." In February, 1925, Gatner left respondents' employ. Within a short time thereafter respondents paid him $2,500. Gatner claimed an interest in the business he had brought in. Respondents say he asked for this by way of loan and threatened to see the insurance companies and other defendants and divulge the names of witnesses in the respondents' cases unless it was forthcoming. The fact remains that $2,500 was paid Gatner and respondents took from him a general release and an affidavit in which he swore that he was never employed to hire people to obtain damage suits for respondents; and he knew of no arrangement whereby any person was to be paid any consideration for bringing the cases in; that he was making the affidavit " because I do not want it assumed or suspected that I was engaged to procure or obtain any negligence cases or damage suits for the said Levy & Becker." Subsequently Gatner instituted an action in Kings county against respondents in which he asserted an interest in their business; respondents set up the general release, and obtained a verdict on the special issues involving the release.

After Gatner left respondents' employ, Sam Abrams, one of the individuals Gatner claimed to have hired as an ambulance chaser, was paid $1,500 by respondents. Respondents testified Abrams claimed he had been hired by Gatner to render certain special services in connection with certain cases; that they had no means of disputing his claim, and they paid $1,500 " in order to avoid further unpleasant publicity."

Respondents kept no books showing their expenses or how much was paid to their employees.

The referee stated in his report in reference to the general charge

of solicitation: " Gatner's testimony I have rejected as vitiated by his falsities and lack of credibility. Without that testimony, it is my view that the petitioners' burden of proof of the specific charges set forth in the petition have not been sustained."

Gatner's character is such that any court would be justified in rejecting his testimony, if it were without corroboration. His vehement enmity towards respondents is so great that it colors all his testimony. There is, however, in the testimony of respondents themselves corroboration of much of Gatner's testimony.

Respondents admit employing Gatner. Why was he employed? Respondents say .to bring in " counsel work " in negligence cases. The person who recommended Gatner to respondents, although displaying the greatest desire to help respondents before the referee, makes no mention of Gatner's ability to obtain counsel work. Gatner, in fact, did not bring in any such business. He did bring in negligence business to such an extent that, despite full knowledge of his criminal record, respondents retained him and familiarity with his record did not affect their relations. Respondents' story that he was employed to bring in counsel work cannot be accepted. The more contemptible in character Gatner is shown to be, the more degrading becomes respondents' retention of him in their employ, their continued use of his tainted services, the intimacy of their relations with him, as shown by Becker's post cards, and the dinner which Levy admittedly attended, given as Gatner says to have Levy discuss terms with certain doctors assembled by Gatner, whereby they were to get twenty-five per cent on all business sent to respondents by them; and as Levy says to meet some doctor friends of Gatner's, whom the latter wanted Levy to meet. The association with Gatner by respondents is one that no reputable member of the bar would indulge in and can only be explained by their greed to make money through him, no matter how it was obtained.

Respondents offer no satisfactory explanation of the sudden development of their negligence business. The referee said: " The respondents cannot escape responsibility for the consequence by disclaiming knowledge of how the retainers came into their office or by expressing disapproval of any improper methods which may have been used without their knowledge." The attitude the respondents have taken in this regard lends corroboration to Gatner's testimony that development of the negligence business was the result of the efforts he and his assistants were making. New retainers may come in as the result of an acquired reputation for obtaining large settlements and verdicts, but before such a reputation may be established cases must be obtained to try or

settle. The only reasonable explanation as to how they were obtained is that furnished by Gatner.

The circumstances surrounding the payment of $2,500 to Gatner by respondents confirm Gatner's story of his relations with respondents. The carrying out of a threat to disclose to respondents' opponents in litigation information concerning witnesses in such litigation could not be forestalled by an affidavit to the effect that Gatner had never been engaged in soliciting business for respondents. A reading of that affidavit shows that then Gatner must have been asserting the relationship which he has testified to before the referee. The affidavit was obtained in an attempt to silence him. We note that this transaction occurred some years before the investigation ordered by this court known as the "Ambulance Chasing Investigation." Attorneys who were pursuing the practice of the law along ethical lines could have nothing to fear as the result of any claim from any one of Gatner's type. Respondents' conduct at that time demonstrates a consciousness of guilt. Absence of records prevents the ascertainment of the relation the amount paid bore to the amount of business taken in. The release proved an effective legal defense to any claim Gatner thereafter asserted. The payment to Abrams is a further acknowledgment of indulgences in methods they feared to have scrutinized.

The record establishes that respondents employed Gatner for the sole purpose of developing a negligence business for them; that Gatner and his "runners" did develop this business through solicitation. Despite their testimony that they did not know how the retainers came to them, we are forced to the conclusion that respondents were fully aware of the activities of Gatner and the other "runners," accepted the retainers, and now must be held accountable for their unethical conduct in connection therewith.

Another serious charge set forth in the petition is that involving the hindering and delaying of the "Ambulance Chasing Investigation" before Mr. Justice WASSERVOGEL. The record discloses that when respondents were called in that investigation they declined to give any testimony whatsoever as to how their negligence business arose, whether the cases were solicited, whether they knew the various individuals whom Gatner claims to have employed, whether what Gatner did was done with their knowledge and consent, whether there was any book in the office that showed the name of the runner that brought the case in, and other questions vitally important to the conduct of the investigation. The respondents asserted in each case that they declined to answer on the ground that the answers might tend to incriminate them.

The position of the respondents, as set forth in their brief in the present proceeding, is that Gatner had previously testified before Mr. Justice WASSERVOGEL, that these respondents were then called to the stand without the aid of counsel, without any knowledge as to what Gatner had previously stated and they were asked certain questions in an attempt to elicit from them admissions that they had actually employed persons for the purpose of soliciting negligence retainers. Such an arrangement would be a crime under the Penal Law (§ 274) and would be ground for disbarment. They claim that they were actually so situated that, no matter how they answered, their answers might be fitted in with the testimony of Gatner and an attempt made to bring criminal proceedings against them; that under these circumstances they were unquestionably entitled to assert their privilege.

The best way in which to make clear the position taken by respondents on the hearings during the investigation is to quote from their testimony.

Extracts from the testimony of Joseph Levy before Mr. Justice WASSERVOGEL:

" By Mr. Kresel: Q. Mr. Levy, will you tell us how you managed to get this large number of negligence cases? A. I decline to answer upon the ground that to do so might tend to incriminate me. Q. You decline to answer that question upon the ground that the answer might tend to incriminate you? A. Yes. Q. Well, is it the fact, Mr. Levy, that you and your firm have had in your employ a man who you sent out to solicit these negligence cases? A. I decline to answer that question upon the same ground. Q. Upon what ground? A. Upon the ground that to answer might tend to incriminate me. * * * Q. Do you know David Schaefer? A. If I saw him I might know him. Q. Did you not have him in your employ soliciting negligence cases for you? A. I decline to answer that upon the ground that it might tend to incriminate me. Q. You mean that the answer to that question might tend to incriminate you? A. It might. Q. Did you have in your employ a man named Sam Abrams? A. I decline to answer that upon the ground, the same ground. Q. Upon what ground? A. Upon the ground that to answer it might tend to incriminate me. Q. Did you have in your employ a man named Ellenbogen? A. I do not know such a man. Q. Never heard of Ellenbogen? A. I may have heard of the name Ellenbogen. Q. Didn't you have a man in your employ by that name? A. Inasmuch as I do not know, I will make the answer that to answer might tend to incriminate me. Q. You mean because you are uncertain as to whether you did or did not have that person in

your employ you now state under oath that to answer that question might tend to incriminate you? A. I do not want to answer it one way or the other because I have not any exact knowledge of the subject. Q. You consider then, as a member of the Bar, that the proper answer to that question under those circumstances is that to answer the question might tend to incriminate you? A. I do not want to answer falsely and inasmuch as I do not know, I will take what I consider the course that I should take. Q. And, therefore, you say that to answer that question might tend to incriminate you. A. Yes, to answer it one way or the other. Q. That is your answer to that question? A. Yes. * * * Q. What business did you have with Tony Sigoni? A. I recall one instance where we had Tony Sigoni investigate a case in which an Italian was the plaintiff. Q. Yes, is that all the business that your firm had with Tony Sigoni? A. Inasmuch as I am not positive, Mr. Kresel, I will say that I decline to answer the question further upon the ground that to do so might incriminate me. Q. Is it not the fact that you decline to answer the question because if you spoke the truth you would have to admit that Tony Sigoni was a runner for you? A. I decline to answer that further than I have already answered it. Q. In other words, you decline to answer the question upon the ground that to answer it would tend to incriminate you? A. I have given my answer. Q. Is that the answer? A. What is the question? Q. The question is whether the truth is not that Tony Sigoni was a runner for your firm and went out and solicited negligence cases for you? A. I decline to answer that upon the ground that to do so might tend to incriminate me. * * * Q. Yes, and did Mr. Gatner employ for your firm several people who were instrumental in getting that negligence business for you? A. I decline to answer that upon the ground that to do so might tend to incriminate me. * * * Q. Has anybody solicited negligence business for you in the last five years? A. I decline to answer that upon the ground that to do so might tend to incriminate me. * * *."

Extracts from the testimony of Aaron M. Becker before Mr. Justice WASSERVOGEL:

" By Mr. Kresel: Q. Mr. Becker, tell us how you managed to work up this considerable negligence practice from no beginning, so to speak, in 1924? A. Cases were recommended by friends and by others, clients recommended cases. Q. Yes. A. We recovered large verdicts and that attracted cases into the office, people would come in and ask us to take their cases. Q. Yes. Are those the only source of your negligence cases? A. I respectfully refuse to answer. By the Court: Q. Why? A. On the

ground that it might tend to incriminate me. By Mr. Kresel: Q. Let me ask this question specifically, Mr. Becker. Whether it is not the fact that your firm employed men to go out and solicit negligence cases for your firm? A. I refuse to answer the question on the ground that it might tend to incriminate me. By the Court: Q. You mean that to answer that question might tend to incriminate you? A. Yes, your Honor. * * * Q. Do you know a man named Tony Sigoni? A. I respectfully refuse to answer the question upon the ground that the answer might tend to incriminate me. * * * Q. Isn't it the fact that Tony Sigoni was a runner for your firm who went out and solicited for you retainers in negligence cases? A. I refuse to answer the question on the ground that the answer might tend to incriminate me. Q. You realize, don't you, Mr. Becker, that if that was not the fact, no, would be an answer to it? A. I do not know. Q. You do not know? A. Probably not, probably ' no ' would be an answer. Q. But you decline to answer the question upon the ground that to make an answer to it might tend to incriminate you? A. Yes. * * * Q. Isn't it the fact that Sam Gatner went out and solicited cases for you and that you paid him for it? A. Who? Q. Abraham Gatner? A. I do not know that he did solicit any cases for my firm. He was a clerk in my office. Q. Then your answer is that he did not? A. I refuse to answer the question upon the ground that the answer might tend to incriminate me. * * * Q. Isn't it the fact that Abraham Gatner was the man that you employed who started this negligence business for you? A. I refuse to answer the question on the ground that the answer to it might tend to incriminate me. Q. Isn't it a fact that you employed Gatner and instructed him to employ other runners and that he did employ other runners for you and that you paid him for it and that they went out and got this negligence business for you? A. I refuse to answer the question upon the ground that the answer might tend to incriminate me. * * * Q. Did Gatner employ other business getters for you? A. I refuse to answer the question upon the ground that the answer might tend to incriminate me. * * * Q. Didn't he employ other people for you to go out and get business? A. I refuse to answer the question upon the ground that the answer might tend to incriminate me. * * * Q. Didn't he go out to solicit negligence cases for you? A. I refuse to answer the question upon the ground that the answer to it might tend to incriminate me. Q. Didn't he, in fact, bring in negligence cases for you for which you paid him? A. I refuse to answer that question upon the ground that the answer might tend to incriminate me. * * * Q. I will

give you another one. You had a case in the Supreme Court, New York County, in which Salito Massaro was the plaintiff and Turner, Blanchard Corporation were the defendants in which you sued for $50,000 damages, will you tell me how you got that case? A. I refuse to answer on the ground that the answer to that question might tend to incriminate me. Q. You state that to answer, in other words, how you got that case that I have described might tend to incriminate you? A. Yes, sir. Q. You had a case entitled Skelly against the French Line in which you sued for personal injuries and finally settled the case for $1,000, and I want you to tell us how you got that case. A. I refuse to answer the question upon the ground that the answer might tend to incriminate me. * * * Q. Do you know a man named William Feinberg? A. I respectfully refuse to answer the question upon the ground that the answer might tend to incriminate me. Q. Do you know a man named Max Corbin? A. I refuse to answer the question upon the ground that the answer might tend to incriminate me. * * * Q. Isn't it a fact, Mr. Becker, that Mr. Feinberg was a runner for you and went out to solicit negligence cases for you and brought in retainers for you and you paid him for it? A. I refuse to answer the question upon the ground that the answer might tend to incriminate me. Q. Isn't the same true about Mr. Corbin? A. I refuse to answer that question upon the ground, the same ground. Q. Do you know Walter Murray — or Walter Wolf? A. I have heard the name of Wolf, but I do not know any first name, I do not recall his first name. Q. Isn't it a fact that Wolf supplied you with negligence cases and you paid him for it? A. I refuse to answer the question upon the ground that it might tend to incriminate me. * * * Q. Did you have a man in your employ named Schaeffer? A. I refuse to answer the question upon the ground that the answer might tend to incriminate me. Q. Did you have a man in your employ by the name of Ellenbogen? A. I refuse to answer that question upon the ground that the answer might tend to incriminate me. * * * Q. Isn't it the fact that each one of those persons whose names I have mentioned were solicitors of negligence cases for you and went out and did solicit them and that you paid them for it? A. I refuse to answer the question on the ground that the answer might tend to incriminate me. * * *."

This witness was shown lists of cases brought by his firm against clients of the Travelers Insurance Company and the Zurich Indemnity Company, and was asked to state how each one of those cases was obtained, and he refused to answer upon the ground that the answer might tend to incriminate him.

A consideration of the testimony of both the respondents as given before the referee demonstrates how insincere and sham these claims of privilege were, and that they were advanced simply to hinder and impede the original investigation, not only so far as they were concerned but in its entire scope, and to serve as an encouragement to others who might desire to defeat its purpose. Attorneys owe a duty to uphold the honor of their profession and to aid any effort under the direction of the court to root out corruption and fraud.

In support of their position respondents rely on the case of *People ex rel. Taylor* v. *Forbes* (143 N. Y. 219). In that case it appears that the grand jury had instituted an inquiry with a view of ascertaining the person or persons responsible for the injection, into the dining hall and the adjoining kitchen, where the freshman class of a college was having its annual banquet, of a quantity of chlorine gas, of such poisonous power that it caused the death of a colored servant in the kitchen and many of the students attending the banquet were seriously affected by it. The relator was subpœnaed before the grand jury as a witness. He was asked certain questions by the district attorney and declined to answer on the ground that his answers might tend to incriminate him. On report of the facts to the court by the district attorney an order was directed to be entered whereby the relator was adjudged guilty of contempt for refusing to answer, and that for such contempt he be imprisoned in the county jail until purged of the same, not exceeding thirty days. From that order relator appealed. The Court of Appeals said (opinion by O'BRIEN, J.): " The broad question thus presented upon these facts is whether the relator was in fact guilty of such conduct as subjected him to the power of the court to punish for contempt, or simply exercised a right secured to him by law. * * * The relator, though in fact he may be innocent, was so situated with reference to it, and so related to the circumstances and results, that it is apparent that at some point and in some way it became, under all the circumstances, not only prudent, but necessary and proper, to claim the privilege of refusing to disclose the information sought to be elicited by the questions. He was a student in the college. He belonged to the sophomore class and the class in chemistry. He boarded at the house from which the jugs were taken by some one. His room mate, at least, seems to have been one of the persons suspected as being in some way connected with the transaction. He was so surrounded by elements of circumstantial proof that the answer to any of the questions might form a link in the chain sufficient to subject him to the hazard of a trial upon a criminal

charge. Whether innocent or not, there was a combination of facts and circumstances that brought him perilously close to the charge which was the subject of investigation, and the answer which he was required to give might have completed the chain of proof. He was thus placed in a position where he might lawfully claim the protection of the law and remain silent."

The investigation before Mr. Justice WASSERVOGEL was not an investigation of a crime. It was a judicial inquiry of "a practice commonly known as 'ambulance chasing,' that is, the solicitation by lawyers of their employment to prosecute damage cases on the basis of the contingent fees" and the evils inherent in the practice of "ambulance chasing" and had for its objects the termination of the abuses complained of in the petition upon which it was ordered and the taking of such remedial measures as might be found advisable to prevent the danger of their recurrence, with such disciplinary action as might be found to be required by the proof adduced. It was a proceeding, as stated in the opinion of this court directing the investigation, "primarily based on the right of the Supreme Court, under the statute, to exercise power and control over attorneys and counselors at law." (*Matter of Bar Association of City of New York*, 222 App. Div. 580, 581, 584.)

The Court of Appeals, in *People ex rel. Karlin* v. *Culkin* (248 N. Y. 465), upholding the power of the Appellate Division to direct the investigation, pointed out its character. There the court said, by CARDOZO, Ch. J.: "The precise question to be determined is whether there is power in the Appellate Division to direct a general inquiry into the conduct of its own officers, the members of the bar, and in the course of that inquiry to compel one of those officers to testify as to his acts in his professional relations. The grand jury inquires into crimes with a view to punishment or correction through the sanctions of the criminal law. There are, however, many forms of professional misconduct that do not amount to crimes. Even when they do, disbarment is not punishment within the meaning of the criminal law (*Matter of Rouss*, 221 N. Y. 81, 85). Inquisition by the court with a view to the discipline of its officers is more than a superfluous duplication of inquisition by the grand jury with a view to the punishment of criminals. The two fields of action are diverse and independent. True, indeed, it is that disbarment may not be ordered without notice of specific charges (Judiciary Law [Cons. Laws, ch. 30], § 476; *Matter of Eldridge*, 82 N. Y. 161; *Matter of an Attorney*, 83 N. Y. 164). So also an indictment must precede a conviction

of a felony. We cannot know today whether charges will be laid against the relator as an outcome of his testimony or of the testimony of others. If preferred, they will be the subject of a separate proceeding, as separate as proceedings before and after an indictment. The requirements of the law as to the formulation of a charge are inapplicable to an inquisition in advance of the preferment of the charge."

The court further said: " ' Membership in the bar is a privilege burdened with conditions' (*Matter of Rouss, supra,* p. 84). The appellant was received into that ancient fellowship for something more than private gain. He became an officer of the court, and, like the court itself, an instrument or agency to advance the ends of justice. His co-operation with the court was due whenever justice would be imperilled if co-operation was withheld. He might be assigned as counsel for the needy, in causes criminal or civil, serving without pay (Code Crim. Pro. § 308; Civ. Prac. Act, §§ 196, 198). He might be directed by summary order to make restitution to a client of moneys or other property wrongfully withheld (*Matter of H., an Attorney,* 87 N. Y. 521). He might be censured, suspended or disbarred for ' any conduct prejudicial to the administration of justice ' (Judiciary Law, § 88, subd. 2). All this is undisputed. We are now asked to hold that when evil practices are rife to the dishonor of the profession, he may not be compelled by rule or order of the court, whose officer he is, to say what he knows of them, subject to his claim of privilege if the answer will expose him to punishment for crime (*Matter of Rouss, supra*). Co-operation between court and officer in furtherance of justice is a phrase without reality if the officer may then be silent in the face of a command to speak."

The court upheld the power of the court to compel the relator in that proceeding to testify, and in conclusion said: " In the long run the power now conceded will make for the health and honor of the profession and for the protection of the public. If the house is to be cleaned, it is for those who occupy and govern it, rather than for strangers, to do the noisome work."

The Court of Appeals in upholding the power to compel testimony in the investigation, limited the power by reiterating the right of the witness to claim his privilege if the answer will expose him to punishment for crime. The observation of the privilege is qualified by the condition that it must be asserted in good faith. What was the situation when respondents had recourse to the constitutional privilege? They had no knowledge of what Gatner

had testified to. There was no suggestion that any crime had been committed. Notwithstanding that they declined to answer questions relative to their practice. Before the referee they were asked questions along the same lines and, instead of consistently asserting the constitutional privilege, they not only answered the questions but a reading of the record discloses that they were most voluble and submitted to the most rigid cross-examination without objection. The only apparent difference between the situation before Mr. Justice WASSERVOGEL and that before the referee is that at the later date they knew what Gatner's testimony was. We can only view their refusal to answer before the justice presiding at the investigation as a contumacious refusal, as officers of the court, to co-operate with the court in the effort which was then being made to rid the profession of the evil practices which had become a scandal. Their resort to the assertion of the constitutional privilege was a subterfuge to stop, if possible, the inquiry into their connection with the corruption which was undermining respect for members of the bar, and to hinder and impede the investigation generally, and to encourage others to do the same. That it was not asserted in good faith is demonstrated when, before the referee, they answered questions without objection and without claiming any privilege which theretofore they had stubbornly refused to answer. A reading of their continued and contumacious refusal to answer questions before Mr. Justice WASSERVOGEL upon the ground that their answers would tend to incriminate them, is sufficient to demonstrate how unfit they are to remain members of the bar. If their answers given before the referee are true, the privilege earlier claimed as to the very matters thus freely testified to before him, was manifestly sham, fraudulent and without foundation and stamps their whole procedure before Mr. Justice WASSERVOGEL as in bad faith.

It was anticipated that one of the results of the " Ambulance Chasing Investigation " would be the institution of proceedings looking to the disciplining of attorneys engaged in that practice. The courts have repeatedly held that the constitutional privilege does not apply where the testimony sought to be elicited may lead to disbarment. There seems to have been some confusion on this point as the result of the decision in *Matter of Kaffenburgh* (188 N. Y. 49). But in *Matter of Rouss* (221 N. Y. 81) that confusion was cleared up. Referring to its decision in *Matter of Kaffenburgh*, the court said: " Much that was said was in reality unnecessary to the decision. There was no occasion to determine whether Kaffenburgh's refusal to testify was proper because it tended to expose him to a forfeiture of office. * * * *Matter of Kaffen-*

*burgh* did not decide that disbarment for professional misconduct is a penalty or forfeiture within the meaning of an act of amnesty (*Matter of an Attorney*, 86 N. Y. 563). *If it did, we could not follow it.*" The Court of Appeals also said in *Matter of Rouss* (*supra*): " Membership in the bar is a privilege burdened with conditions. A fair private and professional character is one of them. Compliance with that condition is essential at the moment of admission; but it is equally essential afterwards (*Selling* v. *Radford*, 243 U. S. 46; *Matter of Durant*, 80 Conn. 140, 147). Whenever the condition is broken, the privilege is lost. To refuse admission to an unworthy applicant is not to punish him for past offenses. The examination into character, like the examination into learning, is merely a test of fitness. To strike the unworthy lawyer from the roll is not to add to the pains and penalties of crime. The examination into character is renewed; and the test of fitness is no longer satisfied. * * * ' The question is,' said Lord MANSFIELD, ' whether, after the conduct of this man, it is proper that he should continue a member of a profession which should stand free from all suspicion ' (*Ex parte Brounsall*, Cowp. 829). ' It is not,' he continued, ' by way of punishment; but the court, on such cases, exercise their discretion whether a man whom they have formerly admitted, is a proper person to be continued on the roll or not.' * * * On that high plane the jurisdiction was thus early placed, and in that high spirit it has been exercised. Even pardon will not elude it. Pardon blots out the offense, and all its penalties, forfeitures and sentences; but the power to disbar remains (*Matter of an Attorney*, 86 N. Y. 563)."

Either of these charges (1) or (2) if proven would justify the removal of respondents from the practice of the law. Both charges have been satisfactorily established. This record demonstrates that the respondents are unfit to remain members of an honorable profession and they should both be disbarred.

FINCH, McAVOY, MARTIN and O'MALLEY, JJ., concur.

Respondents disbarred.