In the Matter of JEROME O. ELLIS, Admitted as an Attorney as JEROME ELLIS, Respondent.'

Second Department, February 7, 1940.'

*Harold M. Kennedy* [*Robert Abelow* and *Murray M. Halwer* with him on the brief], for the motion.

*James J. McLoughlin* [*Seymour Kempner* and *Ira L. Tilzer* with him on the brief], for the respondent.

JOHNSTON, J. The Richmond County Bar Association submitted a petition to this court alleging that a survey made by its committee on unlawful practice of the law disclosed the existence of a practice

commonly known as " ambulance chasing." The petitioner enumerated the methods employed and emphasized the consequences which flow from this practice not only to the injury of litigants but to the discredit of the bar, and prayed that a confidential judicial investigation be ordered.

On June 13, 1938, this court directed that a secret inquiry be made by the Supreme Court, at a Special Term thereof, concerning the conduct of attorneys in the solicitation and prosecution of personal injury claims, the solicitation and procurement of retainers in condemnation proceedings, and other unlawful and unethical practices impairing the due administration of justice in Richmond county. Mr. Justice HOOLEY was assigned to conduct the inquiry and Mr. Harold M. Kennedy was designated to assist him. The inquiry proceeded as ordered.

Respondent, a member of the bar for ten years, residing and having an office in Richmond county, was requested to attend before the court and testify. He appeared before the Special Term and, prior to any interrogation, stated he would answer no question, furnish no information and not waive immunity. Respondent was then sworn. After some preliminary questions, in reply to which he repeated that he would disclose nothing, answer no question and refuse to waive immunity, in response to the following question put by the court he made the following answer: " Q. * * * Does the court understand your position to be that you decline to answer any question in regard to this investigation in connection with your activities in the practice of law in Staten Island, on the ground that those answers will tend to incriminate or degrade you? A. Precisely so."

Three other attorneys, Walsh, Bregoff and Grae, also were requested to appear before the Special Term and testify. Each refused to sign a waiver of immunity, although they expressed a willingness to testify, believing that if they testified they would secure immunity from prosecution.

Mr. Justice HOOLEY then made his report to this court. Thereafter, pursuant to the provisions of section 476 of the Judiciary Law, an order was made authorizing and directing Mr. Kennedy to prosecute charges of alleged unprofessional conduct against respondent. Subsequently, charges embodying in substance respondent's conduct before the Special Term were made to this court. It was charged that by his conduct respondent willfully concealed and intended to conceal facts, acts and deeds either connected with his practice of law or otherwise; that his conduct and concealment were in part a mere pretext to enable him to withhold information which he was in duty bound to divulge; that

by his conduct and concealment respondent endeavored to and did in part thwart and impede the inquiry. Respondent in his answer states that in failing to answer the court's questions and refusing to waive immunity he was motivated solely by a desire to preserve his constitutional right against self-incrimination in case he was prosecuted for any claimed criminal act. On December 13, 1938, the matter was referred to an official referee to take proof and report with his opinion.

The official referee found that the charges were established and that respondent's attitude before the Special Term was a mere pretext; that his conduct was contemptuous, and he was unfit to continue the practice of the law. The referee recommended that if this court should conclude that respondent's conduct did not warrant striking his name from the roll he be suspended until he purged himself by agreeing to testify under a waiver of immunity.

The first question presented is: Were the charges proved? We cannot assume, as do the dissentients, that at the time the respondent asserted his privilege he had reason to apprehend his answers would expose him to punishment for crime. As will presently appear, the contrary is the fact. It is true that in an effort to justify his assertion of privilege respondent testified before the referee that there was " general gossip " in Richmond county and that the press carried stories to the effect that there was a " possibility " of a criminal investigation of the attorneys on Staten Island and a special prosecutor would be designated " to find out what was what as far as the criminal activities of the attorneys were concerned." But when respondent appeared before the Special Term he had no knowledge of what had been testified to against him or any one else. In fact, as far as he knew, no one connected with the inquiry had suggested that a crime had been committed. Nevertheless he declined to answer any question " in regard to this investigation in connection with your [his] activities in the practice of law in Staten Island, * * *." It clearly appears that respondent's refusal to answer was contumacious and his resort to the claim of privilege was sham. Before the referee, in response to a question of his counsel, respondent testified that when he asserted his constitutional privilege at the Special Term he had no " honest, sincere apprehension or fear concerning the results of any answers or information that might be disclosed." On cross-examination he testified he " knew nothing in connection with [his] practice, upon which a criminal prosecution could rightfully be based." If those answers before the referee were true, respondent's assertion of privilege before the Special Term was fraudulent. A witness " may not claim his privilege when he is clearly contu-

macious, not acting in good faith but making the claim as a mere pretext to avoid giving non-incriminating answers." (*Matter of Levy*, 255 N. Y. 223, 225.) Under the circumstances, respondent's refusal to testify was a challenge to the inquiry as a whole and constituted a contempt. (*People ex rel. Karlin* v. *Culkin*, 248 N. Y. 465.) It is admitted that prior to his appearance before the Special Term respondent conferred with Walsh and Grae. He had no recollection of conferring with Bregoff. The record justifies the finding of the referee that respondent and the others were acting in concert in an effort to impede the inquiry. To paraphrase the language of the late Presiding Justice DOWLING in *Matter of Becker* (229 App. Div. 62, 76), the claimed privilege was a subterfuge to stop, if possible, the inquiry into the unlawful and unethical practices which were undermining respect for members of the bar and to hinder and impede the investigation generally, and to encourage others to do the same. We hold, therefore, that the charges were proved and that respondent's position before the Special Term was not taken in good faith but was a mere pretext to impede and defeat the inquiry ordered by this court.

The second question presented, and the only one which merits discussion, is: Was respondent guilty of professional misconduct or conduct prejudicial to the administration of justice? We hold he was.

This court, for good and adequate reasons, ordered the inquiry with respect to the administration of justice in Richmond county. That it had the right to do so cannot be doubted. (*People ex rel. Karlin* v. *Culkin, supra*.) " Attorneys owe a duty to uphold the honor of their profession and to aid any effort under the direction of the court to root out corruption and fraud." (*Matter of Becker, supra*, at p. 73.)

Obviously, it was the duty of attorneys practicing in Richmond county, when requested, to aid the court in its investigation. Their " co-operation with the court was due whenever justice would be imperilled if co-operation was withheld. * * * Co-operation between court and officer in furtherance of justice is a phrase without reality if the officer may then be silent in the face of a command to speak." (*People ex rel. Karlin* v. *Culkin, supra*, at p. 471.) Without their co-operation the inquiry would be both futile and abortive. Respondent and the others mentioned not only failed to co-operate with the court but did their utmost to thwart the investigation. They thereby impeded the court in its effort to sustain the honor of the profession and protect the public in its dealings with its members.

Respondent contends he had a right to assert his privilege. We hold that not every witness is entitled to remain silent as soon as he invokes his constitutional privilege against self-incrimination. Any witness " may be compelled to answer when he contumaciously refuses, or when it is perfectly clear and plain that he is mistaken, and that the answer cannot possibly injure him, or tend in any degree to subject him to the peril of prosecution." (*People ex rel. Taylor* v. *Forbes,* 143 N. Y. 219, 231.) No constitutional right is involved. " No question of constitutional right to remain a member of an honorable profession arises when an attorney delays or impedes justice by the contumacious assertion of spurious privileges." (*Matter of Levy, supra,* at p. 226.)

*Matter of Becker* and *Matter of Levy* (*supra*) are authorities, if any be needed, for our holding that respondent was guilty of professional misconduct or conduct prejudicial to the administration of justice. In those cases, under almost identical facts, the respondents were disbarred. Under our view of the facts this is all that need be said so far as the instant proceeding is concerned.

As heretofore indicated, the minority finds that at the time respondent asserted his privilege he had fair reason to apprehend a possible criminal prosecution. In other words, he was acting in good faith. Even if it were possible to accept this premise, our conclusion would be the same. Therefore, we feel impelled, in view of the dissenting opinion, to give our reasons.

The presiding justice deplores the attitude of the respondent and concedes that it was his duty, when summoned, to attend the inquiry and testify unreservedly. He contends, however, that respondent's defiance of the admitted power of the court is sanctioned by the fundamental law of the State (State Const. art. 1, § 6) and by the statutes (Code Crim. Proc. § 10; Civ. Prac. Act, § 355). We answer that there is no constitutional or statutory barrier which prohibits or prevents this court from vindicating its honor. The respondent seeks shelter behind these enactments and the minority holds that he is protected by them. We do not share this view. We recognize that respondent has a dual status; he is here not only as an attorney but as a citizen. We assume that all constitutional privileges inure to the benefit of lawyer and layman alike. Nor do we hold that any rights guaranteed to respondent as a citizen may be denied him because he is an attorney. If we did, the persuasive and decisive utterances of the distinguished jurists, quoted in the dissenting opinion, would be pertinent. Here there is no constitutional right involved. Respondent has no constitutional or statutory right to his office of attorney. Membership in the bar is not a right but a privilege; " a privilege burdened

with conditions. A fair private and professional character is one of them. Compliance with that condition is essential at the moment of admission; but it is equally essential afterwards. (*Selling* v. *Radford*, 243 U. S. 46; *Matter of Durant*, 80 Conn. 140, 147.) Whenever the condition is broken, the privilege is lost." (*Matter of Rouss*, 221 N. Y. 84, 85.)

We cannot subscribe to the statement of the learned presiding justice that the Constitution, statutes and, by virtue of them, the courts, have placed a seal of approval upon respondent's assertion of privilege. Examination of the cases cited and, we venture to say, of all other cases in this State, will show that no court has ever approved the act of an attorney in claiming his privilege under facts similar to those involved in the instant proceeding.

The cases relied upon by the presiding justice are not controlling. Each may be readily distinguished. *Matter of Cohen* (115 App. Div. 900) and *Matter of Kaffenburgh* (Id. 346; affd., 188 N. Y. 49) may be considered together. There the respondents were charged with professional misconduct because at the trial of their employer — Hummel — for conspiracy, they refused to answer questions concerning their connection with or knowledge of the crime, on the ground that their answers would incriminate them. The court held that it was impossible to conclude from the fact they availed themselves of their constitutional privilege that they were intentionally deceiving the court or were guilty of crime.

In *Matter of Schneidkraut* (231 App. Div. 109) the referee found that the respondent willfully impeded and thwarted the inquiry by refusing to answer questions on the ground that his answers would incriminate him and that his assertion of privilege was a mere pretense. This court dismissed the charge, holding that there was no justification for the finding that the position assumed by the respondent was intended to thwart or impede the inquiry and that the privilege asserted had a substantial and genuine basis. That case must be limited to its own peculiar facts. An examination of the record discloses that the respondent had been examined on three separate occasions, at which he did not refuse to answer any question. It was not until his examination was nearly completed and after an interview with the examiner, at which the latter made reference to respondent's " apparent thievery " and that he was " going to jail," and, like two others who were mentioned, he was " going up the river," that the respondent asserted his privilege. Moreover, about the time the charges were presented respondent and his clerk were indicted for taking the identical money of one of his clients, whose complaint was the basis of the

disciplinary proceeding. Notwithstanding that upon the trial of that indictment the entire group of seven complaints made against the respondent was the subject of inquiry, the respondent and his clerk were acquitted. We do not believe that case is authority against the principle for which we contend, but if it is we cannot follow it.

In *Matter of Solovei* (250 App. Div. 117; affd., 276 N. Y. 647) the respondent was charged, among other things, with misconduct in that he refused to waive immunity with respect to testimony to be given by him before a grand jury which had indicted certain persons for the crime of conspiracy to obstruct justice. Respondent, although not indicted, was named as a co-conspirator. This court dismissed the charge, stating (at p. 120): " The question of good faith is not involved here, (1) because the respondent was willing to answer any questions which would be asked of him, and (2) since this was a proceeding dealing with a conspiracy to obstruct justice, the respondent could have been compelled to testify whether he was willing or not. (Penal Law, § 584.) "

*Matter of Vaughan* (189 Cal. 491; 209 P. 353) is not in conflict with our views. It merely determines that a disciplinary proceeding is not a criminal prosecution nor an aid to a criminal prosecution, and at such a proceeding the accused may decline to answer questions on the ground that his testimony would tend to incriminate him. As heretofore shown, the respondent is not charged with misconduct because he declined to answer the court's questions and claimed his privilege at a disciplinary proceeding directed against him, but an inquiry ordered by the court into the administration of justice.

The minority also relies on the following sentence from the opinion in *People ex rel. Karlin* v. *Culkin* (*supra*, at p. 471): " We are now asked to hold that when evil practices are rife to the dishonor of the profession, he may not be compelled by rule or order of the court, whose officer he is, to say what he knows of them, *subject to his claim of privilege if the answer will expose him to punishment for crime*." It is stated the above sentence means that a lawyer who asserts his constitutional privilege has not offended the dignity or power of the court. We respectfully disagree. The court in the *Karlin* case (*supra*) did not decide the question whether the assertion in good faith of the privilege against self-incrimination is ground for disbarment. This is clear because three years later, in the *Levy* case (*supra*), the court said it was unnecessary to consider that question and six of the judges who sat in the *Levy* case sat in the *Karlin* case. Moreover, in the *Karlin* case the respondent did not claim his privilege. He challenged the power of the court to direct a general inquiry into the conduct of its officers. The court held his refusal to testify was a contempt.

It is also suggested that the distinguished jurist who wrote in the *Karlin* case could not have meant that one may claim the privilege as matter of right and yet have done a wrong which subjects him to discipline. With due respect, we believe the writer meant just that, because he stated: " There are, however, many forms of professional misconduct that do not amount to crimes. Even when they do, disbarment is not punishment within the meaning of the criminal law." The writer also knew that " The courts have repeatedly held that the constitutional privilege does not apply where the testimony sought to be elicited may lead to disbarment." (*Matter of Becker*, 229 App. Div. 62, 76.) While the precise question we are called upon to determine was not involved in the *Karlin* case (*supra*), our views are fortified by a reading of the whole opinion. There, Chief Judge CARDOZO traced the power, now vested in this court by statute (Judiciary Law, § 88, subd. 2), from the Constitution of 1777, and discussed the duty of lawyers when so directed by the court, to give aid by their testimony in uncovering abuses. He also reverted to the history of the profession in England to show the origin of the power and how it was there exercised. The learned chief judge stated at page 472: " If a barrister was suspected of misconduct, the benchers of his inn might inquire of his behavior. We can hardly doubt that refusal to answer would have been followed by expulsion." If the benchers failed in the performance of their duties, then the judges, in their capacity as visitors, exercised their reserved power. " Short shrift," said the chief judge, " would there have been for the barrister who refused to make answer as to his professional behavior in defiance of the visitors " (p. 473). It was also pointed out in the same scholarly opinion, characteristic of the chief judge, that more than three centuries ago, in dealing with the same evils which our inquiry was designed to uproot, the English courts compelled attorneys to submit to an inquisition as to professional misconduct, and the end of the inquisition was not punishment, but discipline. It may be urged that in England there is no constitutional provision guaranteeing the privilege against compulsory self-incrimination. But for centuries the common law acknowledged the existence of such a right.

We cannot agree that the Constitution of the State of New York has created a standard of duty for attorneys and that it has given respondent the right to do what he has done. This court has power and control over attorneys, and may censure, suspend from practice or remove from office any attorney guilty of professional misconduct or any conduct prejudicial to the administration of justice. (Judiciary Law, § 88, subd. 2.) It is for this court to

fix the standard of duty for its officers and to say what constitutes professional misconduct. We are neither diffident in defining that duty nor hesitant in pronouncing the policy which hereafter will be followed. If an attorney is summoned to assist the court by his testimony at its investigation, instituted to uncover unlawful and unethical practices impairing the due administration of justice, and he refuses to answer the court's questions on the ground that his answers would tend to incriminate or degrade him, or unless he is granted immunity, he is guilty of professional misconduct or conduct prejudicial to the administration of justice and will be disbarred.

We believe that in adopting this policy we are sustained by reason and supported by authority. Such a policy is in keeping with the present public policy of the State. In adopting the recent amendment (Art. 1, § 6) to the Constitution, the People declared that a public officer who, when called before a grand jury to testify concerning the conduct of his office or the performance of his official duties, refuses to sign a waiver of immunity or to answer any relevant question concerning such matters, shall be removed from office by the appropriate authority, or shall forfeit his office at the suit of the Attorney-General. The attitude of the respondent and the others mentioned shows the need for this court to take the same view with respect to its officers' refusal to sign a waiver of immunity or to answer any relevant question when they are called upon by the court to aid it in its investigation as to the administration of justice. We recognize that it required a constitutional amendment to accomplish the removal of a public officer when he asserted his constitutional privilege against self-incrimination. That was because he had a right to or in the office to which he had been appointed or elected. But, as heretofore shown, no one who does not possess the requisite character, even though he possesses the required learning, has a right to membership in the bar. Could any one doubt the power of this court to deal summarily with its clerk if he were guilty of like conduct, under like circumstances? Should the court's officer be treated differently than the court's clerk? To ask the question is to answer it. To quote again the late Chief Judge CARDOZO in the *Karlin* case: " If the house is to be cleaned, it is for those who occupy and govern it, rather than for strangers, to do the noisome work " (p. 480).

While we have defined the policy which hereafter will obtain, we do not believe that the extreme penalty of disbarment should be imposed in the instant proceeding. Respondent was advised by experienced counsel that in invoking his privilege before the

Special Term and the referee he was within his rights, but toward the close of the hearing before the latter he changed his position and expressed his willingness to waive immunity and answer any question.

The respondent has failed in his duty as an attorney and should be suspended from the practice of the law for a period of six months.

ADEL and CLOSE, JJ., concur; LAZANSKY, P. J., with whom TAYLOR, J., concurs, dissents in opinion and votes to deny the motion to confirm the report of the official referee and to dismiss the charges.

LAZANSKY, P. J. (dissenting). Respondent appeared at the Special Term appointed by this court to investigate conditions at the bar on Staten Island and refused to testify on the ground that his answers would tend to incriminate him. He says he did this because (1) of the advice of two lawyers, who became his counsel, men of large experience and high standing for ability and integrity at the bar, that he should stand on his constitutional rights; (2) he had information and it was a matter of common gossip and newspaper publication that there was a possibility of a criminal investigation of the attorneys on Staten Island and of a petition being presented to the Governor for the purpose of having a special prosecutor to find out about criminal activities of attorneys; and that, while he knew nothing in his past experience that would warrant a charge of a criminal nature against him, he felt that in ten years at the bar one is bound to make enemies and that there might be something unwarranted or unfounded whereby he might be the object of a criminal investigation and indictment. He was not asked any specific questions as to his professional activities.

Under these circumstances, it may not be said that respondent acted in bad faith when he refused to answer questions on the ground that the answers would tend to incriminate him. That he had nothing to fear from an investigation — that is, that he was innocent of any wrongdoing — does not of itself justify a finding of bad faith, for the privilege is " a protection to the innocent though a shelter to the guilty." (*Twining* v. *New Jersey*, 211 U. S. 78.) His reliance upon the advice of counsel is, of itself, sufficient upon which to predicate good faith. It can make no difference if the advice were unsound. His later change of attitude after reflection and contrary advice does not impair his good faith, established at the time of his first appearance. In determining good faith in such a situation, the court is inclined to favor the one claiming the privilege. (*People ex rel. Taylor* v. *Forbes*, 143 N. Y. 219.)

Proceeding upon the assumption that respondent asserted his privilege in good faith, the next question is: May he be disciplined by this court for the position he took before the Special Term which was investigating conditions at the bar in Staten Island? This is a question of vital importance not only to the bar, but to the public generally, and is one that some day should be answered with finality.

To compel one to waive immunity is to deprive him of his constitutional privilege. So the subject may be treated in its broadest aspect — as if the respondent had stood upon his full rights and refused to testify upon the ground that to give answers on the inquiry would be compelling him to be a witness against himself.

Section 88, subdivision 2, of the Judiciary Law provides: " The Supreme Court shall have power and control over attorneys and counsellors-at-law and all persons practicing or assuming to practice law, and the Appellate Division of the Supreme Court in each department is authorized to censure, suspend from practice or remove from office any attorney and counsellor-at-law admitted to practice as such who is guilty of professional misconduct, malpractice, fraud, deceit, crime or misdemeanor, or any conduct prejudicial to the administration of justice; * * *."

Has the respondent been guilty of professional misconduct or any conduct prejudicial to the administration of justice?

A lawyer is not entirely a free agent. To be admitted to the practice of the law one must meet certain rigorous tests of character; when admitted he comes under the control of the courts and then, if charged with wrongdoing, the tests of character are renewed. (*Matter of Rouss,* 221 N. Y. 81.) He is a member of a profession of high ideals and noble traditions. Despite criticism and condemnation, much of which is entirely unwarranted, he remains an important member of his community and occupies a prominent post of trust and confidence. Although not a public officer, he is an officer of the court (*Matter of Burchard,* 27 Hun, 429; *Matter of Dawson* v. *Knox,* 231 App. Div. 490; affd., 267 N. Y. 565), and thus is an agent of law enforcement in duty bound to uphold the dignity and power of the court. He is sworn to uphold the Constitution of the Nation and of the State. He is expected so to conduct himself that his activities will redound to the benefit of general welfare. It would seem necessarily to follow that, when summoned by the court to assist in an investigation of evil practices, it not only becomes his duty, but should be his desire to attend and, if requested to give testimony, to do so without reservation. Surely, no less may be expected of him unless a refusal so to testify is justified by a power to which even the courts must bow.

In my opinion, at the time this respondent was called, the law saved an attorney against a charge of misconduct if he refused to answer questions upon the ground that his answers would tend to incriminate him.

Prior to January 1, 1939, the Constitution of the State provided (Art. 1, § 6): " Nor shall he be compelled in any criminal case to be a witness against himself, * * *."

This privilege obtains in civil as well as in criminal cases. (*Matter of Rouss, supra.*) There is a similar provision in the Federal Constitution (Amendment V), but it is not effective in the States. (*Ensign* v. *Pennsylvania*, 227 U. S. 592; *People* v. *Adams*, 176 N. Y. 351.) Section 10 of the Code of Criminal Procedure is to the same effect. Section 355 of the Civil Practice Act provides: " A competent witness shall not be excused from answering a relevant question, on the ground only that the answer may tend to establish the fact that he owes a debt or is otherwise subject to a civil suit. This provision does not require a witness to give an answer which will tend to accuse himself of a crime or to expose him to a penalty or forfeiture; * * *."

May there be found in the State constitutional limitation and statutory provision vindication of a refusal to answer in an investigation such as the one that was being conducted by this court?

It will not be necessary to trace the historical development of this prerogative, which was in force in England for many years before it came into the Colonies. It will suffice to note at length what distinguished jurists have written with respect of the provision in this State and the similar provision in the Federal Constitution and, by their impressive and decisive words, to be reminded of the significance of this amnesty and how it has become a vital part of the social and political order for the benefit of the *innocent* as well as the guilty.

In *Boyd* v. *United States* (116 U. S. 616) Mr. Justice BRADLEY said: " And any compulsory discovery by extorting the party's oath, or compelling the production of his private books and papers, to convict him of crime, or to forfeit his property, is contrary to the principles of a free government. It is abhorrent to the instincts of an Englishman; it is abhorrent to the instincts of an American. It may suit the purposes of despotic power; but it cannot abide the pure atmosphere of political liberty and personal freedom."

Mr. Justice BROWN in *Brown* v. *Walker* (161 U. S. 591) wrote: " The maxim *nemo tenetur seipsum accusare* had its origin in a protest against the inquisitorial and manifestly unjust methods of interrogating accused persons, which has long obtained in the continental system, and, until the expulsion of the Stuarts from

the British throne in 1688, and the erection of additional barriers for the protection of the people against the exercise of arbitrary power, was not uncommon even in England. * * * The change in the English criminal procedure in that particular seems to be founded upon no statute and no judicial opinion, but upon a general and silent acquiescence of the courts in a popular demand. But, however adopted, it has become firmly embedded in English, as well as in American jurisprudence. So deeply did the iniquities of the ancient system impress themselves upon the minds of the American colonists that the States, with one accord, made a denial of the right to question an accused person a part of their fundamental law, so that a maxim, which in England was a mere rule of evidence, became clothed in this country with the impregnability of a constitutional enactment."

In *Twining* v. *New Jersey* (211 U. S. 78) Mr. Justice MOODY said in part: " The exemption from testimonial compulsion, * * * is universal in American law * * *. It was generally regarded then, as now, as a privilege of great value, a protection to the innocent though a shelter to the guilty, and a safeguard against heedless, unfounded or tyrannical prosecutions. * * * The privilege was not included in the Federal Constitution as originally adopted, but was placed in one of the ten Amendments which were recommended to the States by the first Congress, and by them adopted. Since then all the States of the Union have, from time to time, with varying form but uniform meaning, included the privilege in their Constitutions, except the States of New Jersey and Iowa, and in those States it is held to be part of the existing law."

In that same case Mr. Justice HARLAN wrote in part as follows:

" Certain it is, that when the present Government of the United States was established it was the belief of all liberty-loving men in America that real, genuine freedom could not exist in any country that recognized the power of government to *compel* persons accused of crime to be witnesses against themselves. And it is not too much to say that the wise men who laid the foundations of our constitutional government would have stood aghast at the suggestion that immunity from self-incrimination was not among the essential, fundamental principles of English law. * * *

" Can there be any doubt that at the opening of the War of Independence the people of the colonies claimed as one of their birthrights the privilege of immunity from self-incrimination? This question can be answered in but one way. If at the beginning of the Revolutionary War any lawyer had claimed that one accused of crime could lawfully be compelled to testify against himself,

he would have been laughed at by his brethren of the bar, both in England and America. * * * By the Fifth Amendment, as already stated, it was expressly declared that no one should be compelled in a criminal case to be a witness against himself. Those Amendments being adopted by the Nation, the People no longer feared that the United States or any Federal agency could exert power that was inconsistent with the fundamental rights recognized in those Amendments. It is to be observed that the Amendments introduced no principle not already familiar to liberty-loving people. They only put in the form of constitutional sanction, as barriers against oppression, the principles which the people of the colonies, with entire unanimity, deemed vital to their safety and freedom."

In *Olmstead* v. *United States* (277 U. S. 438) Mr. Justice BRANDEIS, in a dissenting opinion dealing with "wire tapping," said: "The protection guaranteed by the Amendments is much broader in scope. The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone — the most comprehensive of rights and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the Government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment. And the use, as evidence in a criminal proceeding, of facts ascertained by such intrusion must be deemed a violation of the Fifth."

In *People ex rel. Taylor* v. *Forbes* (143 N. Y. 219) Judge O'BRIEN said:

"These constitutional and statutory provisions have long been regarded as safeguards of civil liberty, quite as sacred and important as the privileges of the writ of habeas corpus or any of the other fundamental guaranties for the protection of personal rights.

"When a proper case arises they should be applied in a broad and liberal spirit in order to secure to the citizen that immunity from every species of self-accusation implied in the brief but comprehensive language in which they are expressed. * * * The principle established by these decisions is that no one shall be compelled in any judicial or other proceeding against himself, or upon the trial of issues between others, to disclose facts or circumstances that can be used against him as admissions tending to prove his guilt or connection with any criminal offense of which

he may then or afterwards be charged, or the sources from which or the means by which evidence of its commission or of his connection with it may be obtained."

True it is, there have been advocates of repeal and modification (see Problems Relating to Judicial Administration and Organization, prepared by and under the direction of the Subcommittee on Judicial Powers and Administration of the New York State Constitutional Convention Committee, vol. IX, chap. 12), but in the Nation the privilege has remained firmly fixed from 1791 (U. S. Const., Amdts., art. V), and in the State from 1821 up to 1939 (N. Y. State Const. art. 1, § 6), when it was modified by amendment to be later mentioned. To assist public agencies in endeavors to suppress crime is the moral duty of every citizen and, surely, the duty of the lawyer. Were it not for the consti· tutional provision there could be no doubt whatever that this respondent, on the assumed basis, would be guilty of conduct prejudicial to the administration of justice. But the State Constitution and the statutes have placed, and by virtue of them the courts must place, a seal of approval upon his assertion of the privilege, or at any rate should not condemn him.

The Constitution and the statute are written expressions of the conscience of the People. One who abides thereby may not in law be deemed a transgressor. The constitutional privilege is a fundamental right and a measure of duty; its exercise cannot be a breach of duty to the court. In law, morals and law are one; a legal act is a moral act. Invoking the privilege is a legal act, therefore, a moral act. In Cardozo " The Paradoxes of Legal Science " the following is quoted from the work of a distinguished Anglo-Russian jurist: " A declaration of right is the admission by organized society that the claim is justified from the public point of view." Since the exercise of the privilege is a moral as well as a legal act, it is a standard of conduct for a lawyer which must be respected by the courts. More than that the courts may not require. The law has given, and it is for the law, and not the courts, to take away.

CARDOZO, Ch. J., after referring to the constitutional provision under discussion, said in *Matter of Doyle* (257 N. Y. 244):

" The privilege may not be violated because in a particular case its restraints are inconvenient or because the supposed malefactor may be a subject of public execration or because the disclosure of his wrongdoing will promote the public weal.

" It is a barrier interposed between the individual and the power of the government, a barrier interposed by the sovereign people of the State; and neither legislators nor judges are free to overleap it."

It may be said that it is unthinkable that one who occupies such an important post in the affairs of men should be permitted to go unpunished for what may be deemed, in effect, a defiance of the power and an affront to the dignity of the court. That is based upon false assumption. Defiance and affront there cannot be when the act has the sanction of the fundamental law of the land.

Harsh criticism, severe condemnation, and loss of prestige may be the lot of an attorney who invokes the privilege, but that does not invite a visitation upon him of the disciplinary power of the court. The fault is with the law. In the law the remedy must be found. In the meantime, he who uses its shelter must go undisciplined. He has done no wrong. So it has been held, in effect, by the Appellate Division of the First Department in *Matter of Cohen* (115 App. Div. 900); by this court in *Matter of Schneidkraut* (231 id. 109) and *Matter of Solovei* (250 id. 117; affd., 276 N. Y. 647) and in *Matter of Kaffenburgh* (188 id. 49).

In considering the cases, it should be borne in mind that the investigation by this court was not a disbarment proceeding, and the discussion proceeds upon the basis that the privilege was asserted not to avoid disbarment, but incrimination which might result in a criminal charge.

In *Matter of Kaffenburgh* (*supra*) it appears that Kaffenburgh was a clerk in the office of certain lawyers, one of whom was being tried for conspiracy. He was called as a witness and asked several questions tending to elicit his connection with the matters pertaining to the conspiracy. He refused to answer all of the questions as to his personal transactions *on the ground that his answers might tend to incriminate him.* It was charged in disciplinary proceedings that in refusing to testify he was intentionally deceiving the court or else his connection with these matters was criminal. Reference was made by the court to the provisions of the Federal Constitution and the State Constitution above discussed, and also to section 10 of the Code of Criminal Procedure and section 837 of the Code of Civil Procedure (now section 355 of the Civil Practice Act above mentioned). The effect of self-accusation was considered from two standpoints: the involvement in a criminal accusation and the loss of the office of attorney and counselor at law. The court held that disbarment was a forfeiture within the meaning of section 355, Civil Practice Act. That view was later disaffirmed in *Matter of Rouss* (*supra*). But as to the possibility of being accused of a crime as the result of testifying, the court quoted from *People ex rel. Taylor* v. *Forbes* (*supra*): " The principle established by these decisions is that no one shall be compelled in any judicial or other proceeding against

himself, or upon the trial of issues between others, to disclose facts or circumstances that can be used against him as admissions tending to prove his guilt or connection with any criminal offense of which he may then or afterwards be charged, or the sources from which or the means by which evidence of its commission or of his connection with it may be obtained."

So it may be fairly said that even if the court had held that disbarment was not a forfeiture, it would have decided that the charges were not sustained because the attorney was protected by the constitutional limitation.

In referring to the *Kaffenburgh* case CARDOZO, J., said in *Matter of Rouss (supra)*: " Much that was said was in reality unnecessary to the decision. There was no occasion to determine whether Kaffenburgh's refusal to testify was proper because it tended to expose him to a forfeiture of office. *He had placed his refusal on the ground of a tendency to criminate him, and that of itself was sufficient to sustain him.*"

" Sufficient to sustain " surely means sufficient to sustain him whenever he may be called upon to answer for his refusal.

In *People ex rel. Karlin* v. *Culkin* (248 N. Y. 465) CARDOZO, Ch. J., was discussing the duty of an attorney to give testimony in an investigation such as the one conducted by this court. The attorney refused to testify upon the ground that the court had no jurisdiction. In the opinion it was stated: " We are now asked to hold that when evil practices are rife to the dishonor of the profession, he may not be compelled by rule or order of the court, whose officer he is, to say what he knows of them, subject to his claim of privilege if the answer will expose him to punishment for crime."

The limitation should be carefully noted: " subject to his claim of privilege if the answer will expose him to punishment for crime." By that was meant that the lawyer was not subject to punishment for contempt if he asserted his constitutional privilege; that when he refused to answer on that ground he had not offended the dignity or the power of the court. Surely the distinguished jurist could not have intended to have decreed amnesty in the written word, with a mental reservation that one may claim the privilege as a matter of right and yet have done a wrong which subjected him to discipline.

*Matter of Vaughan* (189 Cal. 491; 209 P. 353) is to the same effect.

The cases mentioned hold, and the words of the former Chief Judge mean, in effect, that a lawyer commits no wrong in asserting the privilege before a grand jury or a court trying a criminal cause. There the claim was made before the sovereign power of the State. If it was not a wrong there, it can be no more a wrong here. If,

in each instance, invoking the privilege results in a failure to make disclosure for the benefit of law and order, the justification therefor is found in the fundamental law, which was adopted for the common weal.

Section 6 of article 1 of the Constitution of the State of New York was amended, effective January 1, 1939, by adding to the words already discussed: " * * * any public officer who, upon being called before a grand jury to testify concerning the conduct of his office or the performance of his official duties, refuses to sign a waiver of immunity against subsequent criminal prosecution, or to answer any relevant question concerning such matters before such grand jury, shall be removed from office by the appropriate authority or shall forfeit his office at the suit of the Attorney-General."

It should be noted that the failure to sign a waiver of immunity applies only to testimony of a public officer before a grand jury and concerning the conduct of his office or the performance of official duties. It does not refer to a public officer called to testify before a grand jury concerning the acts of any other persons; it does not apply in any wise to legislative investigations or to those directed by the Governor or the courts. It is narrow in its scope and limited in its application, and, therefore, may not be deemed the expression of a general change of policy of the people of the State as to the limits of the provision as it stood before amendment. The amendment must be confined to the end sought to be attained by it. However, assuming it were broad enough to apply to a lawyer, it may not be used against this respondent, since it was not enacted until after his appearance before the Special Term. It will require a further amendment to the Constitution before the lawyer may lose the benefit of this time-honored privilege.

The motion to confirm the report of the official referee should be denied and the charges dismissed.

TAYLOR, J., concurs with LAZANSKY, P. J.

Respondent suspended from the practice of the law for a period of six months.