In the Matter of ALBERT MARTIN COHEN, an Attorney, Respondent. DENIS M. HURLEY, Petitioner.

Second Department, December 31, 1959.

*Denis M. Hurley* (*Michael A. Castaldi* and *Michael Caputo* of counsel), for petitioner.

*David F. Price* for respondent.

BELDOCK, J. More than 40 years ago the eminent jurist, Chief Judge CARDOZO, declared: " Membership in the bar is a privilege burdened with conditions. A fair private and professional character is one of them. Compliance with that condition is essential at the moment of admission; but it is equally essential

afterwards * * *. Whenever the condition is broken, the privilege is lost. To refuse admission to an unworthy applicant is not to punish him for past offenses. The examination into character, like the examination into learning, is merely a test of fitness. To strike the unworthy lawyer from the roll is not to add to the pains and penalties of crime. The examination into character is renewed; and the test of fitness is no longer satisfied. For these reasons courts have repeatedly said that disbarment is not punishment '' (*Matter of Rouss,* 221 N. Y. 81, 84–85).

On the ground that respondent, a member of the Bar since 1922, by his conduct has broken *the condition,* this proceeding is brought to declare that he has lost *the privilege* of membership in the Bar.

The genesis of this proceeding is a judicial inquiry undertaken by direction of this court. Advised by the Brooklyn Bar Association's petition (presented after its own investigation) of serious abuses and unethical practices by attorneys in Kings County with respect to their procurement of negligence cases on a contingent basis and with respect to their prosecution of such cases, this court in the exercise of its inherent and statutory power and duty (N. Y. Const., art. VI, § 2; Judiciary Law, § 90; *People ex rel. Karlin* v. *Culkin,* 248 N. Y. 465), ordered a judicial inquiry. The inquiry was ordered with respect to the alleged illegal, corrupt and unethical practices and with respect to the alleged conduct prejudicial to the administration of justice by attorneys and others acting in concert with them, in Kings County. The purpose of the inquiry is to expose all the evil practices with a view to enabling this court to adopt appropriate measures to eliminate them and to discipline those attorneys found to have engaged in them.

The existing conditions in Kings County as a result of the abuses in the handling of negligence cases by attorneys are well portrayed by Chief Judge Cardozo in his summary of the causes leading to the 1928 '' ambulance chasing '' investigation (*People ex rel. Karlin* v. *Culkin, supra,* p. 468). Unfortunately, the evils of yesterday have returned to plague us today.

In fairness and in justice to the legal profession, however, we state at the outset that the number of lawyers who appear to be involved in the alleged unethical practices is minute in relation to the total number of honorable practioners at the Bar in Kings County.

During the period 1954 to 1958 inclusive, pursuant to the rules of this court, the respondent, who apparently specialized

in negligence cases, filed 228 statements as to retainer in his own name and 76 such statements in a firm name, thus indicating that he and his firm had been retained on a contingent basis in a total of 304 negligence cases. He was duly subpœnaed to testify and to produce his records with respect to such cases before the Justice designated by this court to conduct this judicial inquiry at an additional Special Term. On the advice of counsel, respondent invoked his constitutional privilege against self incrimination and refused on that ground to answer pertinent questions and to produce his records.

It is not disputed that respondent has asserted his constitutional privilege in good faith. Nor is it disputed that the questions put and the records sought come within the scope of the inquiry and that the information sought to be elicited would be relevant. Indeed, these facts are virtually conceded by the parties to this proceeding.

The petition now presented to the court seeks to discipline respondent, not on the ground that he has asserted his constitutional privilege, but on the ground that his refusal to answer relevant questions and his refusal to produce relevant records "are in disregard and in violation of the inherent duty and obligation of respondent as a member of the legal profession", in that such refusals (a) are "contrary to the standards of candor and frankness that are required * * * of a lawyer to the Court", (b) are "in defiance of and flaunt [flout] the authority of the Court to inquire into and elicit information within respondent's knowledge relating to his conduct and practices as a lawyer", (c) have "hindered and impeded the Judicial Inquiry" which had been ordered by this court, and (d) have resulted in respondent's withholding "vital information bearing upon his conduct, character, fitness, integrity, trust and reliability as a member of the legal profession".

Thus, the sole question for our determination is whether the respondent, by reason of his refusal to answer revelant questions and to produce relevant records, may be disciplined as a lawyer, or, stated differently, does his constitutional privilege against self incrimination shield him, not only from possible criminal prosecution, but also from disciplinary action as a member of the Bar for failing in his duties, obligations and responsibilities as a lawyer to the court?

This question goes to the heart of a serious and far-reaching problem confronting the Bar, the courts and the public. When this question is finally resolved it will affect the standing at the Bar, not only of this respondent, but of many other lawyers

who similarly have asserted their constitutional privilege against self incrimination as a basis for refusing to divulge pertinent information with respect to their practices in relation to negligence cases. The resolution of this question will also determine in large measure whether this court's supervisory and regulatory power over lawyers, and whether this court's plenary power to curb all evil and unethical practices in the profession of the law, are to be supressed and subverted, and whether this court is to be rendered impotent in the performance of its inherent and statutory duties relating to attorneys and to the administration of justice.

In order to keep in proper perspective the precise question to be decided here, it should be emphasized that with respect to the members of the Bar collectively, this court has the positive affirmative duty, springing both from its ancient plenary jurisdiction over attorneys and from the express statutory delegation of such power, " to keep the house of the law in order ", to compel attorneys " to submit to an inquisition as to professional misconduct ", to ascertain the existence of practices which are prejudicial to the administration of justice, to compel the discontinuance of such practices and to discipline those attorneys who may have engaged in them. For the achievement of these ends this court is empowered to make any rule, to hold any inquisition, and to require any attorney to attend and to give evidence under oath. The end and the aim of the inquisition are not punishment, but discipline. And every attorney, as an officer of the court, has the reciprocal duty to aid the court, to co-operate with it, to obey its rules and orders, to respond to all relevant questions put by the court or by the agency conducting the inquiry on its behalf, and to refrain from doing any act which might thwart the inquiry (Judiciary Law, § 90; *Gair* v. *Peck*, 6 N Y 2d 97, 111; *People ex rel. Karlin* v. *Culkin*, 248 N. Y. 465, 470–479, *supra*; *Matter of Queens County Bar Assn.* v. *Dwyer*, 254 App. Div. 769; *Matter of Cherry*, 228 App. Div. 458, 464–465; *Matter of Brooklyn Bar Assn.*, 223 App. Div. 149, 151–153; *Matter of Bar Assn. of City of New York*, 222 App. Div. 580, 584–587; *Matter of Flannery*, 150 App. Div. 369, 371, affd. 212 N. Y. 610).

And with respect to any particular member of the Bar, whenever the occasion demands or whenever his character and fitness are called into question, this court likewise has the positive affirmative duty to re-examine into them and to ascertain whether he *still possesses* the requisite character and fitness to continue to be a member of the Bar. If it finds that he does

not, it must disbar him — not by way of punishment, but " for the protection of both the court and the public  *  *  *  from the official ministration of persons unfit to practice." An attorney may continue in the practice of the law only so long as he continues in the possession of the requisite character and fitness (Judiciary Law, § 90; *Matter of Thatcher,* 190 Fed. 969, 975–977; *Matter of Donegan,* 265 App. Div. 774, 787–788; *Matter of Rouss,* 221 N. Y. 81, 84–85, *supra*; *Matter of Durant,* 80 Conn. 140, 147).

We disagree with respondent in his contention that the purpose of this proceeding is to discipline him " because he has invoked his constitutional privilege against self-incrimination." Respondent urges, in effect, that his rights as a citizen to be free from punishment for invoking his constitutional privilege are being destroyed if, in his capacity as a lawyer, he may be disciplined for resorting to such privilege as a citizen. But his argument overlooks the undeniable fact that respondent, with respect to his rights as a citizen and with respect to his obligations as a lawyer, stands in a dual position.

We agree that respondent's rights as a citizen may not be withheld or impaired in a disciplinary proceeding. No person, layman or lawyer, may be compelled to give testimony against himself if, in good faith, he claims that such testimony may tend to incriminate him. Nor may any person, layman or lawyer, be compelled to sign a waiver of immunity from future criminal prosecution. And no inference of guilt or misconduct may be drawn from the exercise of such a constitutional privilege. In any inquiry, investigation, trial or proceeding the respondent has every right to assert his constitutional privilege in response to any question, whether it deals with his professional acts as a lawyer or otherwise. And he cannot be disbarred for his assertion in good faith of his constitutional privilege. These principles have been well established by our highest courts and we abide by them.

However, we are not dealing here with an attempt to force respondent to testify despite his assertion of his constitutional privilege against self incrimination or his refusal to sign a waiver of immunity. This is not a typical " Fifth Amendment " case. No action is sought to be taken against respondent because of his beliefs, his affiliations with subversive groups, or any specific act of doubtful propriety. The judicial inquiry here deals generally and essentially with the procurement and the prosecution of negligence cases, and the questions put to respondent relate only to his practices with respect to the 304

statements as to retainer filed by him and his firm and with respect to the negligence cases which they embrace.

Hence, there is involved here only the question of whether respondent in his capacity as a lawyer may be absolved from all his duties, responsibilities and obligations to the Bar and to the court to help expose and uproot evil practices and corruption at the Bar and in the courts with respect to negligence cases. If, as it has been often held, disbarment is not criminal punishment, then by asserting his constitutional privilege against self incrimination and thus gaining immunity from criminal prosecution or *punishment*, is the respondent free to flout and destroy the basic relationship between the lawyer and the court? Can he, with impunity, disregard the Canons of Ethics and cast to the winds all inquiries into his professional conduct as a lawyer? Can he disregard his obligation to be frank and candid with the court? Can he negate his duty to co-operate with this court to expose the evil and unethical practices at the Bar and in the courts? Can he refuse to assist this court in its quest to maintain the integrity and morality of· the members of the Bar and to maintain the high standards of the legal profession? We say, emphatically no.

This court already has expressed its opinion upon the basic question here posed, namely, whether the attorney's right as a citizen to assert his constitutional privilege against self incrimination, suspends his duty as an attorney and officer of the court to aid the court in its judicial inquiry into unethical practices.

In 1940, in *Matter of Ellis* (258 App. Div. 558, 565–566) and in *Matter of Grae* (258 App. Div. 576), a majority of this court, after reviewing the authorities, announced this court's view and future policy with respect to attorneys who assert their constitutional privileges as a ground for refusing to divulge pertinent information upon a judicial inquiry. Such view and policy were stated as follows (p. 566): '' If an attorney is summoned to assist the court by his testimony at its investigation, instituted to uncover unlawful and unethical practices impairing the due administration of justice, and he refuses to answer the court's questions on the ground that his answers would tend to incriminate or degrade him, or unless he is granted immunity, he is guilty of professional misconduct or conduct prejudicial to the administration of justice and will be disbarred.''

In adherence to such policy this court suspended Ellis and Grae from the practice of law. But it did so on two separate and distinct grounds, namely: (1) that their assertion of their

constitutional privilege against self incrimination does not excuse their refusal to testify and to divulge pertinent information; and (2) that their insistence upon retaining their constitutional privilege of immunity from prosecution and declining to sign a written waiver of such immunity, impeded the investigation and constituted conduct prejudicial to the administration of justice.

Thereafter, in both the *Ellis* and *Grae* cases, the Court of Appeals reversed the orders of this court (*Matter of Grae,* 282 N. Y. 428; *Matter of Ellis,* 282 N. Y. 435). Such reversal, however, was based solely on the second ground stated. It was held that the attorneys' refusal to yield their constitutional immunity from criminal prosecution in advance of their testimony and as a condition to permitting them to testify at the judicial inquiry, did not impede the inquiry and is not professional misconduct. This conclusion rested on the express finding of the Court of Appeals that attorneys Grae and Ellis, time and again, had evinced their willingness to co-operate, to testify fully and frankly and to make all their records available if they were not deprived in advance of their constitutional immunity from criminal prosecution by reason of their proffered testimony. The question as to the right of an attorney to refuse to testify in reliance on his constitutional privilege against self incrimination was not reached by the Court of Appeals. Obviously, the consideration of that question became unnecessary because, as stated, both Ellis and Grae were perfectly willing to co-operate with the inquiry and to divulge all relevant information if they had been permitted to retain their constitutional immunity against future criminal prosecution.

Hence, while this court already has taken the unequivocal position that upon a judicial inquiry an attorney, by the assertion of his constitutional privilege against self incrimination cannot avoid his obligation as a member of the Bar and as an officer of the court to divulge all relevant information in his possession, the Court of Appeals has not yet definitively passed upon the precise question.

In the light of the respective duties of court and attorney and in the light of recent decisions, we have now re-examined this court's position as expressed in the *Grae* and *Ellis* cases (*supra*), insofar as it relates to the effect of an attorney's assertion of his constitutional privilege against self incrimination. After such re-examination we have no hesitancy in affirming such position, limiting it however to the effect of the plea against self incrimination. When so limited, the position of this

court is not inconsistent with the position taken by the Court of Appeals in the *Grae* and *Ellis* cases (*supra*), since, as already stated, in those cases the Court of Appeals held only that a waiver of immunity from future criminal prosecution may not be exacted from an attorney as a condition to permitting him to testify in a judicial inquiry.

The highly responsible, and at the same time delicate, position of the lawyer in our society has been well described by Mr. Justice FRANKFURTER (*Schware v. Board of Bar Examiners,* 353 U. S. 232, 247): " Certainly since the time of Edward I, through all the vicissitudes of seven centuries of Anglo-American history, the legal profession has played a role all its own. The bar has not enjoyed prerogatives; it has been entrusted with anxious responsibilities. One does not have to inhale the self-adulatory bombast of after-dinner speeches to affirm that all the interests of man that are comprised under the constitutional guarantees given to ' life, liberty and property ' are in the professional keeping of lawyers. It is a fair characterization of the lawyer's responsibility in our society that he stands ' as a shield,' * * * in defense of right and to ward off wrong. From a profession charged with such responsibilities there must be exacted those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have, throughout the centuries, been compendiously described as ' moral character.' '' Mr. Justice FRANKFURTER also pointed out (pp. 248–249) that it is this " moral character " which " has been the historic unquestioned prerequisite of fitness '' to be a member of the Bar, and that to " a wide and deep extent, the law depends upon the disciplined standards of the profession and belief in the integrity of the courts ''.

It is fair to say, in view of the fiduciary responsibility entrusted to the lawyer, that the corruption or deterioration of his moral character, would undermine the administration of justice and thus endanger the security of the State itself. As so aptly said by Chief Justice CHARLES EVANS HUGHES, the practice of the profession of the law is '' 'the privileged administration of a public trust affording the necessary means by which private and public rights are vindicated, private and public wrongs are redressed, and the very basis of civilization is made secure ' '' (*Matter of Williams,* 158 F. Supp. 279, 280).

The courts, and the lawyers as integral functionaries and officers of the court, are the foundation upon which the administration of justice must rest. And, it has been oft repeated,

the true administration of justice is the firmest pillar of good government. It is for these reasons, as indicated by the cited cases, that the courts from time immemorial have exercised plenary and summary jurisdiction over attorneys, have required them collectively and individually to conform to the highest standards of rectitude and have swiftly disciplined them for any departure from such standards.

When the position of any person is one of trust and responsibility, one which directly affects the public interest or the security of the State, and one which consequently requires a high degree of moral character and fitness, such person may be removed from his position if he elects to assert his constitutional privilege against self incrimination as a basis for his refusal to answer relevant questions which seek to determine whether he still possesses such character and fitness. So the courts recently have held as to a teacher, a subway conductor and a policeman (*Beilan* v. *Board of Educ.,* 357 U. S. 399; *Lerner* v. *Casey,* 357 U. S. 468, affg. 2 N Y 2d 355, affg. 2 A D 2d 1 [2d Dept.]; *Matter of Delehanty,* 280 App. Div. 542, affd. 304 N. Y. 725; *Christal* v. *Police Comm. of San Francisco,* 33 Cal. App. 2d 564).

It is true that in the four cases last cited there was a special statute which in effect made compulsory the employee's maintenance of such character and fitness and which permitted his discharge when the administrative agency by which he was employed determined after a hearing that he lacked the requisite character and fitness or that a reasonable doubt exists whether he does. But the principle on which they were all decided is the same, namely: that while the employee is entitled to refuse to answer any relevant question on the ground that his answer might tend to incriminate him, nevertheless, by reason of his refusal to divulge the relevant information sought, the agency was justified in concluding that he lacked the requisite character and fitness and in removing him from his position. The rationale is, not that he is being punished for invoking his constitutional privilege, but rather that he is being removed from his position because the agency, by reason of his refusal to furnish the information sought, is entitled to conclude that he no longer possesses the requisite character and fitness to continue in the agency's employ.

Of course, no statute is needed to prescribe the high moral character at all times requisite for the lawyer or to define his obligation to the court or his duty to promote the administration of justice and never to impede it. As indicated by the

cited cases, such character, obligation and duty are implicit and fundamental; they have been the prerequisites of the office of an attorney and counselor at law from time immemorial, and without them the true administration of justice could not long survive.

But since the high standard of conduct to which the lawyer must conform is incapable of precise definition the Legislature has wisely confided to this court a plenary power and control over all lawyers (Judiciary Law, § 90, subd. 2; *Gair* v. *Peck,* 6 N Y 2d 97, *supra*; *People ex rel. Karlin* v. *Culkin,* 248 N. Y. 465, *supra*; *Matter of Brooklyn Bar Assn. of City of N. Y.,* 223 App. Div. 149, *supra*). And, as observed some years ago by the Court of Appeals: '' In establishing the standard of conduct to which the bar must at its peril conform, the Appellate Division has a wide discretion, with which we have neither the wish nor the power to interfere '' (*Matter of Flannery,* 212 N. Y. 610, 611, *supra*).

Respondent relies on several cases (to wit, *Matter of Grae,* 282 N. Y. 428, *supra*; *Matter of Ellis,* 282 N. Y. 435, *supra*; *Matter of Kaffenburgh,* 188 N. Y. 49, 52–53; *People ex rel. Karlin* v. *Culkin,* 248 N. Y. 465, *supra*) as upholding the attorney's right to immunity from disbarment by reason of his assertion of his constitutional privilege against self incrimination. In our opinion, none of them so holds, as will be indicated below. Moreover, as already noted, the real question to be determined here is, not whether the attorney is immune from disbarment by reason of his assertion of his constitutional privilege, but whether the attorney is immune from disbarment by reason of his refusal to co-operate with the court in a judicial inquiry into unethical practices and by reason of his refusal to come forward with an explanation of his conduct when the circumstances require it.

In the *Grae* and *Ellis* cases (*supra*), the Court of Appeals, as previously noted, settled and decided only one proposition, namely, that an attorney who is willing to testify in a judicial inquiry but who is unwilling, in advance of his testimony and as a condition to permitting him to testify, to sign a waiver of immunity from future criminal prosecution, is not subject to discipline by this court by reason of his refusal to sign such waiver. Indeed, this holding is consistent with our own prior holding (cf. *Matter of Solovei,* 250 App. Div. 117, affd. 276 N. Y. 647), as well as with our holding in the instant case.

In the *Kaffenburgh* case (188 N. Y. 49, 52–53, *supra*) the Court of Appeals held only that an attorney could not be dis-

barred because on the trial of his former employer upon an indictment for conspiracy to defraud, the attorney, who had appeared as a witness, had invoked his constitutional and statutory privilege against self incrimination and had refused to answer relevant questions. That case did not involve the refusal of an attorney to divulge information upon a judicial inquiry, such as the one here.

In the *Karlin* case (248 N. Y. 465, *supra*), during the course of a judicial inquiry such as the one here, the attorney appeared in court but refused to be sworn or to testify as to his conduct in the procurement of retainers. The Court of Appeals, in an opinion by CARDOZO, Ch. J., held that he had been properly held in contempt for his refusal. The only point it decided was that the attorney could not thus defy the inquiry and thwart its purpose by refusing to testify as to what he knows about the evil practices in the profession. Incidentally, the court also indicated (p. 471) that his testimony would be " subject to his claim of privilege if the answer will expose him to punishment for a crime ". But the only inference to be drawn from this remark is that if he did testify in the judicial inquiry he could claim his privilege against self incrimination without fear of being held again in contempt and without fear of future criminal prosecution. The remark had no relation to the question of whether or not the attorney, if he should assert his constitutional privilege in good faith, could thereafter be disciplined or disbarred as an attorney because of his refusal to divulge relevant information sought in the judicial inquiry. That this is so is made quite plain by the sharp distinction which Chief Judge CARDOZO himself drew between a criminal and a disciplinary proceeding. He pointed out that: " The grand jury inquires into crimes with a view to punishment or correction through the sanctions of the criminal law. There are, however, many forms of professional misconduct that do not amount to crimes. Even when they do, disbarment is not punishment within the meaning of the criminal law * * *. *Inquisition by the court with a view to the discipline of its officers is more than a superfluous duplication of inquisition by the grand jury with a view to the punishment of criminals. The two fields of action are diverse and independent* ". (*People ex rel. Karlin* v. *Culkin*, 248 N. Y. 465, 470 [emphasis supplied].)

This conclusion as to the holding in the *Karlin* case (*supra*) also finds ample support in the opinion of the Court of Appeals in a subsequent case (*Matter of Levy*, 255 N. Y. 223, 225). In the *Levy* case, the Appellate Division in the First Department

had disbarred an attorney because it found that upon a judicial inquiry, similar to the one here involved, he had pleaded his constitutional privilege in *bad faith*. The Court of Appeals dismissed the appeal on the ground that the constitutional privilege is not available when it is urged in bad faith and, hence, no question of constitutional construction is properly before the Court of Appeals. It then, apparently, went out of its way, however, to state (p. 225) that it would "pass as unnecessary for consideration at this time the question whether the assertion in good faith [upon a preliminary judicial inquiry] of the privilege against self-incrimination is ground for disbarment."

It will be noted that the *Levy* case was decided two years after the *Karlin* case, that the same judicial inquiry was involved in both cases, that the opinion in the *Levy* case cites the *Karlin* case, and that, notwithstanding the *Karlin* case, the Court of Appeals in the *Levy* case clearly indicated that the issue here involved is still an open one and would be decided by the Court of Appeals only when it became necessary to do so and when it is properly presented.

It is also significant that the statutes granting a witness immunity from prosecution or from any penalty or forfeiture when he is compelled to answer despite the assertion of his constitutional privilege against self incrimination, are not deemed to include disbarment. Such immunity statutes do not include disbarment because they are ordinarily "designed to give an immunity as broad as the constitutional privilege, and no broader", because the Constitution provides that no person shall be compelled in any criminal case to be a witness against himself, and because a proceeding looking to disbarment is not a criminal case or a penalty or forfeiture (*Matter of Rouss,* 221 N. Y. 81, 86, *supra*; *People ex rel. Karlin* v. *Culkin,* 248 N. Y. 465, 470, 475, *supra*; *Matter of Solovei,* 250 App. Div. 117, 121, affd. 276 N. Y. 647, *supra*).

In view of (a) the high standard of character and morality required of the attorney as a condition both to his admission and *to his retention* in the fellowship of the Bar, (b) the close fiduciary relationship between him and the court, (c) his solemn duty to uphold the integrity of the courts and the Bar and to promote the administration of justice, (d) this court's plenary power and control over him in his capacity as an attorney and counselor at law, (e) the fact that, for good cause shown, this court has initiated a judicial inquiry into unethical practices of attorneys in relation primarily to negligence cases, and (f) the fact that in the course of such inquiry it appeared that

the respondent and his firm filed a large number of statements as to retainer (an average of more than 60 a year during the five-year period from 1954 to 1958) for such negligence cases, we say that upon interrogation by the court or its agency there is cast upon him as an officer of the court the affirmative duty to come forward with a full and adequate explanation of every such retainer and to thus re-establish his high moral character.

This conclusion also necessarily flows from the fact that to the extent of respondent's examination before this judicial inquiry, such inquiry inevitably became a preliminary inquiry *pro tanto* into his personal practices for the purpose of determining whether he had engaged in unethical conduct and for the purpose of determining whether he still possessed the high moral character requisite for a member of the Bar.

We repeat: every attorney has an absolute right to assert his constitutional privilege against self incrimination as the basis for his refusal to give any explanation of his conduct or his activities, and when he does so he cannot be compelled to testify. But the moment he asserts his constitutional privilege he creates his own dilemma. Thereupon, after opportunity for reflection (which was here given to the respondent), it is for the attorney to choose whether he will rest upon his constitutional privilege or whether he will discharge his duty to co-operate with the court in its judicial inquiry into unethical practices. If, as here, he deliberately elects not to co-operate with the court, then the court has no alternative but to revoke his privilege to continue as a member of the Bar. For his duty to the court is inviolable. He cannot remain mute, thereby sterilizing the power of the court and frustrating its inquiry into unethical practices, and yet be permitted to retain his privilege of membership in an honorable profession.

Such membership, it should be emphasized, is a *revocable* privilege. "There is no vested right in an individual to practice law. Rather there is a right in the Court to protect itself, and hence society, as an instrument of justice" (VINSON, Ch. J., *Matter of Isserman*, 345 U. S. 286, 289). We should be ever mindful of the admonition of Mr. Justice BRANDEIS that "If we desire respect for the law we must first make the law respectable" (Lief, The Brandeis Guide to the Modern World, p. 166).

To avoid any possible doubt as to our position, we state again that the basis for any disciplinary action by this court is, not the fact that respondent has invoked his constitutional privilege against self incrimination, but rather the fact that he has

deliberately refused to co-operate with the court in its efforts to expose unethical practices and in its efforts to determine incidentally whether he had committed any acts of professional misconduct which destroyed the character and fitness required of him as a condition to his retention of the privilege of remaining a member of the Bar.

As Chief Judge CARDOZO pointed out in the *Karlin* case (*supra* p. 473), the court will make " short shrift " of such a lawyer; it will promptly strike his name from the roll of attorneys and deprive him of his privilege to practice. And, as indicated, such deprivation or such disbarment is not deemed to be punishment, but discipline which the court was always empowered to administer (*People ex rel. Karlin* v. *Culkin,* 248 N. Y. 465, *supra*; Judiciary Law, § 90, subd. 2).

Respondent should be disbarred and his name should be ordered to be struck from the roll of attorneys, with leave to apply to vacate the order to be entered hereon upon proof that, within 30 days after the entry thereof, he has answered before the Justice presiding at the judicial inquiry all relevant questions and has produced before such Justice all relevant records in accordance with the subpœna duces tecum.

NOLAN, P. J. (concurring). If this were a matter of first impression, I would favor a determination in accordance with the views expressed in the dissenting opinion of Presiding Justice LAZANSKY in *Matter of Ellis* (258 App. Div. 558, 567–575). However, the precise question presented here was decided by this court in that proceeding contrary to the views expressed by the Presiding Justice, and that decision was not affected by the reversal in the Court of Appeals of our determination made at the same time that the failure by the respondent in that proceeding to sign a waiver of immunity constituted professional misconduct. Consequently, I concur in the result.

KLEINFELD, J. (dissenting). Despite all disclaimers to the contrary, respondent is being disbarred for pleading his privilege against self incrimination. The Court of Appeals of this State is committed to the view that this cannot be done and in *Matter of Grae* (282 N. Y. 428, 434–435) stated: " The privilege against self-incrimination is a constitutional guaranty of a fundamental personal right. Long regarded as a safeguard of civil liberty it was firmly imbedded in the law of England and by the Fifth Amendment to the Federal Constitution became a basic principle of American constitutional law. ' It is a barrier interposed between the individual and the power of the govern-

ment, a barrier interposed by the sovereign people of the State; and neither legislators nor judges are free to overleap it.' (*Matter of Doyle*, 257 N. Y. 244, 250.) Applying this basic principle to our present problem we have no doubt that when the appellant, as a witness upon the inquiry at the Special Term, declined to sign a waiver of immunity and thus refused to relinquish in advance a privilege which the Constitution guarantees to him, he was within his legal right. As was said by Presiding Justice Lazansky in *Matter of Ellis* (258 App. Div. 558, 572), expressing the minority view at the Appellate Division: ' The constitutional privilege is a fundamental right and a measure of duty; its exercise cannot be a breach of duty to the court.' ''

In *Matter of Kaffenburgh* (188 N. Y. 49, 53) the Court of Appeals quoted with approval the following language from *People ex rel. Taylor* v. *Forbes* (143 N. Y. 219, 228) : '' no one shall be compelled in any judicial or other proceeding against himself, or upon the trial of issues between others, to disclose facts or circumstances that can be used against him as admissions tending to prove his guilt or connection with any criminal offense of which he may then or afterwards be charged, or the sources from which or the means by which evidence of its commission or of his connection with it may be obtained.''

If the respondent is guilty of any violation of the laws, rules or regulations appertaining to the conduct of attorneys, and this is proved in an adversary proceeding against him after he has had the right to confront his accusers, cross-examine witnesses, call witnesses on his own behalf, and the benefit of all of the other safeguards of due process, then he may be disciplined as the court deems proper. Absent such proceeding, the respondent has been denied his rights under the Constitutions of this State and of the United States.

The proceeding should be dismissed.

Wenzel and Ughetta, JJ., concur with Beldock, J.; Nolan, P. J., concurs in separate opinion, in result; Kleinfeld, J., dissents and votes to dismiss the proceeding, in opinion.

Respondent disbarred and his name ordered to be struck from the roll of attorneys, with leave to apply to vacate the order to be entered hereon upon proof that, within 30 days after the entry thereof, he has answered before the Justice presiding at the judicial inquiry all relevant questions and has produced before such Justice all relevant records in accordance with the subpœna duces tecum.